LIBERTY LOBBY, INC., Plaintiff,

v.

DOW JONES & COMPANY, INC., et al., Defendants.

Civ. A. No. 84–3455.

United States District Court, District of Columbia.

July 10, 1986.

Mark Lane, Washington, D.C., for plaintiff.

Robert P. LoBue, Patterson, Belknap, Webb & Tyler, New York City, for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiff Liberty Lobby, Inc., an organization engaged in the espousal of causes, charges defendant Dow Jones & Company, Inc., publisher of *The Wall Street Journal* (*"The Journal"*), with libel.[1] Specifically, it alleges that *The Journal* published two defamatory articles, the first, a 1984 report by co-defendant Rich Jaroslovsky describing Liberty Lobby as "far right ... [and] anti-Semitic[,]" and the second, a 1985 column by nondefendant Suzanne Garment describing in-court proceedings in an earlier suit by Liberty Lobby against another publication.[2] This case is presently before the Court on defendants' post-discovery motion for summary judgment/judgment on the pleadings. The Court finds the case to be governed by both settled law and a trilogy of cases recently decided by the Supreme Court this term and, for the reasons set forth below, will grant defendants' motion in its entirety and dismiss the complaint with prejudice.

## I.

In September, 1984, *The Journal* published a news report by Jaroslovsky which formed the initial basis for this action. Appearing under the headline, "Racial Purist Uses Reagan Plug," the article describes how one Roger Pearson allegedly parlayed a letter of commendation from President Reagan to promote his own publications. As part of its exposition of Pearson's past, the story stated:

> Other Pearson writings appeared in Western Destiny, a magazine published by the far right, anti-Semitic Liberty Lobby. Mr. Pearson edited Western Destiny briefly in the mid–1960s and wrote several books on race and eugenics that were issued by Liberty Lobby's publishing arm. These pamphlets are still sold by the National Socialist White People's Party, the Arlington, Va. based American Nazi group; Mr. Pearson says he doesn't have any connection with that group.

Wall St.J., Sept. 28, 1984, at 56, col. 1. In its "first cause of action" (hereinafter Count I), Liberty Lobby maintains that it never "published" *Western Destiny*, nor did its avowed "publishing arm" ever "issue" books by Pearson; that none of its publications was ever sold by the National Socialist White People's Party; and that it is not "anti-Semitic," although it is willing to admit to being anti-Zionist.

Following a change of counsel, Liberty Lobby amended its complaint to assert four additional "causes of action" (hereinafter Counts II–V), each corresponding to an allegedly libelous section of an October, 1985, column by Garment. *See* Garment,

---

1. Jurisdiction is conferred by 28 U.S.C. § 1332 (1982).

2. *See Liberty Lobby, Inc. v. National Review, Inc.*, No. 79–3445 (D.D.C. filed Dec. 21, 1979).

*There's Nothing Like a Libel Trial For an Education,* Wall St.J., Oct. 11, 1985, at 28, col. 3.[3]

Count II alleges a republication of the defamation asserted in Count I by the following sentence: "Still pending is a Liberty Lobby suit against The Wall Street Journal, which last year called Liberty Lobby 'anti-Semitic' and reported that it had published various tracts by a promoter of racial betterment through genetic selection."

Count III concerns the following passage in Garment's column:

Across the room with Mr. [Willis] Carto [Liberty Lobby's founder and chief executive] were the bearded Mr. [Mark] Lane [attorney for Liberty Lobby] in friendly navy blazer and gray slacks, a young female paralegal with the kind of nose that suggests the presence of a trust fund, and a young, good-looking black female lawyer in a high-collared blouse. The moment the jury filed in—all black, as is not uncommon in the District [of Columbia]—you began to suspect that Mr. Lane might have something in mind.

Count IV complains of the following:

So we see the Liberty Lobby standing up in court and calling Mr. [William F.] Buckley [publisher and editor of *The National Review*] racist, most likely calculating that black jurors will be too hypnotized by this possibility to consider other facts important. This is not just an ordinary lawyer's trick. This is breathtaking in its daring. Most of us would be embarrassed to appeal to a racial or religious minority audience so crudely. We know the Fair Play Patrol would at once swoop down and cart us away. But the Carto team is of sterner stuff, able to put its head down and go for broke.

Count V, the final "cause of action," concerns a paragraph which reads:

It gets you thinking about libel suits in general and their place in democratic politics. They are in vogue now, especially as a way to fight the press. Without a doubt current journalistic habits deserve some fighting against. Still, these suits attacking pernicious speech generate their own share of pernicious speech. Trials held to fight destructive ugliness in American public life provide their own arena in which the parties can make ugly appeals. Highly public events like a blazing newspaper headline, or Louis Farrakhan wowing them at Madison Square Garden, can be a grim sight. But believe me, Mark Lane in front of the jury also generates a distinct shiver.

**II.**

Defendants contend that the record they have amassed in the course of discovery here demonstrates conclusively that each and every statement in the Jaroslovsky article is either true or a non-actionable opinion, and that Jaroslovsky and *The Journal* have shown that they published without the "actual malice" required as a predicate to their liability. Thus, summary judgment is in order on Count I. The Garment column, says *The Journal,* is unmistakeably opinion/commentary on its face and may claim First Amendment sanctuary, entitling it to judgment on the pleadings on Counts II–V.

Those aspects of the Jaroslovsky article which Liberty Lobby says are false—aside from its being "anti-Semitic"—are the assertion that Pearson's books were "issued" by its "publishing arm" and are still being sold by a Nazi organization. In truth, says Liberty Lobby, Pearson's books were pub-

**3.** Garment was covering the *National Review* trial before another judge of this court. In the *National Review* case, Liberty Lobby alleged that the magazine had libeled it in an article linking it with the National Caucus of Labor Committees and the presidential candidacy of Lyndon LaRouche. *The National Review* counterclaimed, also for libel, alleging that articles in Liberty Lobby's weekly magazine, *The Spotlight,* had made false assertions about *The National Review.* In June of 1983, the judge granted *The National Review's* motion for summary judgment dismissing Liberty Lobby's complaint and granting it partial judgment on its counterclaims. The court then presided over a jury trial on damages and the remaining counterclaims, with judgment ultimately being entered on a verdict awarding *The National Review* $1 in compensatory and $1,000 in punitive damages against Liberty Lobby.

lished by "Noontide Press," which has no formal, entity-to-entity relationship with Liberty Lobby. Defendants cite to discovery responses made by Liberty Lobby which strongly support an inference that Liberty Lobby and Noontide Press share a common *alter ego* in the person of Carto who, for practical purposes, "controls" both. Liberty Lobby's only response is a single short, conclusory, (and evasive) affidavit by Carto denying it, and Liberty Lobby's anti-Semitism as well, from which it argues that the issue is clearly one of fact necessitating a trial.

Whether Noontide Press is, in fact, the "publishing arm" of Liberty Lobby, and Willis Carto and Liberty Lobby are one and the same for purposes of this case, however, the fact is immaterial, for the assertion that they are is not, on its face or otherwise on this record, defamatory in the least of Liberty Lobby but for the allegedly pejorative characterization of the entire conglomerate as "anti-Semitic."

At the outset, the Court suspects, as the district judge held in *Liberty Lobby, Inc. v. National Review, Inc.*, No. 79–3445, slip op. at 7–10 (D.D.C. Apr. 20, 1983), that the term "anti-Semitic," as Jaroslovsky has used it, is probably constitutionally protected opinion. *See Ollman v. Evans*, 750

F.2d 970, 974–84 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). To the extent that "anti-Semitism" might be said to be an objectively verifiable fact,[4] however, it is difficult to imagine a case in which the evidence of it would be more compelling. Liberty Lobby admits to being anti-Zionist, but not necessarily anti-Semitic, the difference being that anti-Zionists are antipathetic toward Jews only as a political force and not as a racial or religious entity. There may be such a distinction, but it cannot be made with respect to Liberty Lobby's obvious mindset here. Defendants have amassed through discovery a vast collection of circumstantial evidence of Liberty Lobby's institutional anti-Semitism in its most malign sense;[5] Liberty Lobby offers once again only Carto's affidavit of denial to refute it.

■ There is, moreover, affirmative evidence from defendants that *The Wall Street Journal* published the article in good faith and without "actual malice," i.e., that the defamatory publication was not made with "knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974).[6]

---

**4.** It has been observed that "'the state of a man's mind is as much a fact as the state of his digestion.'" *Commissioner v. Culbertson,* 337 U.S. 733, 743 n. 12, 69 S.Ct. 1210, 1215 n. 12, 93 L.Ed. 1659 (1949), *quoting Edgington v. Fitzmaurice,* 29 L.R.Ch.Div. 459, 483.

**5.** The evidence is collated and summarized in the 133–page affidavit of defendants' counsel, Robert P. LoBue, in support of the motion for summary judgment, with supporting exhibits.

Liberty Lobby, it appears, maintains a multivolume archives file labeled "Jews" which contains some 20 years of press clippings dealing with Jews, Judaism, and Israel. The file includes articles with such titles as "Moves to Outlaw Jewish Gestapo," "Communism is Jewish," "Israel is also Crooks' Promised Land," "A Summary of Zionist and Israeli Acts of Terrorism (1920–1984)," "The Jews are Not Israel—Fifty Reasons Why," and "The Theory and Practice of Anti-Semitism."

More important, however, than its collection of what others have written are its own publications and public statements. Running throughout issues of *The Spotlight,* Liberty Lobby's offi-

cial organ, is the theme that the Holocaust—the extermination of Jews in Europe by the Nazis during World War II—never occurred. Other articles promote the view that Jews are guilty of deicide in the crucifixion of Jesus Christ, are intolerant of and hate Christians, are unpatriotic and disloyal to the United States, and have disproportionate influence on American government. One article laments that Soviet Jewish imigres "may be circumcised at U.S. taxpayer expense;" another bemoans increased supermarket prices caused by the cost of kosher food processing; yet another warns of a conspiracy of "international Jewish bankers."

**6.** Proof of "actual malice" is required when "public officials" or "public figures" seek to recover damages for defamatory falsehoods. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967) (Opinion of Harlan, J.). Liberty Lobby concedes that it is a "public figure" for purposes of this case.

Defendants' own affidavits and supporting exhibits show, to the contrary, that Jaroslovsky spent three months intermittently researching the story, reviewed several Liberty Lobby documents and articles about Liberty Lobby, and showed the material he collected to his immediate supervisor and editor, convincing them of the verity of Liberty Lobby's anti-Semitism. Finally, *The Journal's* Washington bureau chief reviewed the article and, being familiar with Liberty Lobby's radio program and *The Spotlight,* believed the characterization of the organization to be accurate.

Liberty Lobby has presented absolutely *no* evidence, by way of affidavit or otherwise, from which it could be found that Jaroslovsky and his editors knew that Liberty Lobby was *not* anti-Semitic, or that they acted with reckless disregard for the truth of the matter.

### III.

■ This past April, in *Philadelphia Newspapers, Inc. v. Hepps,* —— U.S. ——, ——, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986), the Supreme Court held that, in cases such as this, the First Amendment requires that the burden of proof of the falsity of an allegedly libelous article be placed on a plaintiff who sues a media defendant for defamation.[7] Two months later, in cases decided the same day, the Supreme Court held that a defendant in *any* case is entitled to summary judgment if the evidentiary record before the trial court, following discovery, demonstrates that the plaintiff will be unable to prove an essential element of his *prima facie* case at trial. *Celotex Corp. v. Catrett,* —— U.S. ——, ——, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). At the same time it applied that principle in the context of a libel case to hold summary judgment warranted for a media defendant where the plaintiff is without evidence to satisfy a rea-

sonable jury clearly and convincingly that the defamation had been committed with actual malice. *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, ——, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

Applying the rules of those three cases to the circumstances presented by this one, it appears that Liberty Lobby bears the burden of persuasion of both the falsity of the imputation of anti-Semitism (by, presumably, a preponderance of the evidence), and the actual malice with which it was made, by clear and convincing evidence. Were the case in this posture at the close of all the evidence at trial, and the motion before the Court one for a directed verdict—the standards being the same, *Anderson,* —— U.S. at ——, 106 S.Ct. at 2512; *Celotex,* —— U.S. at ——, 106 S.Ct. at 2552–53 (citation omitted)—the Court would be obliged to take the case from the jury.

No reasonable jury could find on this record that Liberty Lobby has proved *prima facie* that it is *not* anti-Semitic, nor could such a jury find that Jaroslovsky and *The Journal* said that it was with actual malice, there being no evidence of it at all, much less proof that is clear and convincing.

### IV.

■ Liberty Lobby's "second cause of action" in Count II, based on the paragraph of Garment's column which merely reports that Liberty Lobby had sued *The Journal* for calling it anti-Semitic in the Jaroslovsky article, thereby "repeating" the libel, is, of course, extinguished by the demise of Count I. Even were it not, however, Liberty Lobby's argument (no contention being made that Garment incorrectly described its claim) succumbs to the absolute privilege accorded fair and accurate accounts of official reports and records. *See Dowd v. Calabrese,* 589 F.Supp. 1206, 1217 (D.D.C. 1984); Restatement (Second) of Torts, § 611 (1977).

---

7. Truth is otherwise an affirmative defense, of which defendants have the burden. *See Tarlton v. Saxbe,* 507 F.2d 1116, 1122 n. 13 (D.C.Cir. 1974); Restatement (Second) of Torts § 518A (1977).

The gravamen of Liberty Lobby's third through fifth "causes of action" is that the Garment column "was biased, untruthful, and unfair ... [and] that her relationship with *The National Review* led to her decision to report upon the opening statements[,] and that her dislike and contempt for ... Liberty Lobby was buttressed only by her own abysmal ignorance of the law and the facts." Plaintiff's Opposition to Defendants' Motion for Summary Judgment, at 17–18. On deposition Garment acknowledged that she attended and wrote about *The National Review* trial at the suggestion of counsel for the magazine. Her deposition further shows her to be a non-lawyer without any special knowledge of libel law.

All that aside, however, the three disputed passages are simply descriptions of Garment's personal reactions to Liberty Lobby's attorney's opening statement, nothing more. Assuming, for the sake of argument alone, that Garment's account was fanciful, hyperbolic, vindictive, biased, legally mistaken, or all of the above, the First Amendment does not recognize either objective or subjective qualifications for voicing opinions without incurring liability. And these three passages are clearly protected opinion under *Ollman. See* 750 F.2d at 979.

First, the offending portions of all three passages contain statements as to which there can be no clear consensus as to meaning; they depend entirely upon the eye of the beholder and evoke no universal understanding. Second, few, if any, of these statements are objectively verifiable. Third, although written in the first and second person plural, the tenor of Garment's commentary is one of her own subjective impression of Lane's forensic demeanor and not an assertion that others have actually seen it as did she. And fourth, while it may not be conclusive, the placement of a column on a newspaper's editorial page—which is where Garment's column appeared—is some evidence that it was deemed by her editors to be opinion as well. *See Ollman,* 750 F.2d at 986–87.

ORDERED, that defendants' motions for summary judgment and judgment on the pleadings are granted, and the complaint is dismissed with prejudice.