**Willis A. CARTO and Liberty Lobby, Inc., Plaintiffs,**

v.

**William F. BUCKLEY, Jr. and Doubleday & Company, Inc., Defendants.**

No. 84 Civ. 1812 (RJW).

United States District Court, S.D. New York.

Nov. 25, 1986.

* 162 hours claimed—101 hours deducted = 61 hours at $75 = $4,575.00.

**504**

Mark Lane, Washington, D.C., for plaintiffs.

Satterlee & Stephens, New York City, for defendants; Robert M. Callagy, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs Willis A. Carto and Liberty Lobby, Inc. ("Liberty Lobby") commenced this diversity action against defendants William F. Buckley, Jr. and Doubleday & Company, Inc. ("Doubleday") to recover damages for the publication in 1983 of a book that contained allegedly libelous statements. The defendants now move to dismiss the complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., or, alternatively, for summary judgment pursuant to Rule 56, Fed.R.Civ.P. For the reasons that follow, the court grants defendants' motion for summary judgment.

## BACKGROUND

In 1983, Doubleday published a book written by Buckley entitled *Overdrive: A Personal Documentary*. The book contained the following paragraph:

A note from Howard Hunt. He lodged a libel suit several years ago against *The Spotlight*, a publication of the Liberty Lobby, of which a principal figure is Willis Carto. *The Spotlight's* distinctive feature is racial and religious bigotry. Howard writes, "So far Carto has avoided deposition by staying on the West Coast, allegedly; this delays my libel suit's progress." He says he has heard from Carto's lawyer that "Willis Carto ... is by coincidence a target of yours." More exactly, it is the other way around, Carto having attacked me and *National Review* for years, presumably upon learning that we thought the Protocols

of the Learned Elders of Zion a forgery. We were finally ourselves forced to sue Carto (or, more exactly, countersue), and the stuff (depositions, motions) is in the hands of the judge—the slowest judge in history. (A few weeks later, Howard called me in high exultation to say that the jury had awarded him a judgment of six hundred and fifty thousand dollars. *The Spotlight* had alleged about Hunt, among other jocularities, that he would probably be implicated in the assassination of John Kennedy.)

W.F. Buckley, Jr., *Overdrive: A Personal Documentary* 57–58 (1983).

Liberty Lobby, an incorporated not-for-profit lobbying organization that publishes the weekly paper *Spotlight*, contends that the sentence *"The Spotlight's* distinctive feature is racial and religious bigotry" defamed it. Carto, the founder of Liberty Lobby, similarly contends that the phrase "... Carto having attacked me [Buckley] and 'National Review' for years, presumably upon learning that we thought the Protocols of the Learned Elders of Zion a forgery" likewise defamed him. On October 6, 1983, the plaintiffs, through their counsel, demanded in writing that the defendants retract the allegedly defamatory statements. The defendants refused to do so.

On March 14, 1984, the plaintiffs filed this libel action requesting both compensatory and punitive damages. The complaint charges that in making the statements referred to above

the defendants intended to and did convey the claim and impression that the plaintiffs Willis A. Carto and Liberty Lobby, Inc. give credence to the so-called Protocols of the Learned Elders of Zion, which are in fact a monstrous anti-Semitic forgery, and therefore the defendants intended to and did convey the claim and impression that the plaintiffs Willis A. Carto and Liberty Lobby, Inc., support and advocate anti-Semitism of the most ugly sort.

Complaint at ¶ 11. Defendants now move to dismiss the complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., or, alternatively, for summary judgment pursuant to Rule 56, Fed.R.Civ.P., contending first that the passages at issue qualify as constitutionally protected opinion, and second that the plaintiffs cannot establish by clear and convincing evidence that the defendants published the statements with knowledge of falsity or reckless disregard of the truth.

## DISCUSSION

Because it has examined matters outside the pleadings, the Court will consider the present motion as one for summary judgment. A Court may grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11, No. 86–7294, (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)). While the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir.1983), "[t]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

While the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a Court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Insurance, supra,* at 12. The motion then

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of person opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

### I. *Defamation and the First Amendment*

■ Although states create statutory or common law causes of action for defamation,[1] the First Amendment of the Constitution, which the Fourteenth Amendment makes applicable to the states, *Murdock v. Pennsylvania*, 319 U.S. 105, 108, 63 S.Ct. 870, 872, 87 L.Ed. 1292 (1942), delimits a state's power to award damages for libel, *New York Times Co. v. Sullivan*, 376 U.S. 254, 283, 84 S.Ct. 710, 727, 11 L.Ed.2d 686 (1964).

An analysis of allegedly libelous statements then must be conducted with full cognizance of the value represented by the First Amendment and the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes

---

1. Defamation includes both libel and slander. In New York, whose law applies to this case, plaintiff must establish a *prima facie* case by pleading that defendant (1) negligently or wilfully uttered a (2) defamatory statement (3) of or concerning the plaintiff (4) to a third person (5) which resulted in damage to plaintiff's reputation. *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1439–40 (S.D.N.Y.1986); *see National Nutritional Foods Ass'n v. Whelan*, 492 F.Supp. 374 (S.D.N.Y.1980).

unpleasantly sharp attacks." *Id.* at 270, 84 S.Ct. at 720.

Indefeasible protection of opinion facilitates the free flow of ideas. "Erroneous opinions are inevitably put forward in free debate but even the erroneous opinion must be protected so that debate on public issues may remain robust and unfettered and concerned individuals may have the necessary freedom to speak their conscience." *Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 379, 366 N.E.2d 1299, 1306, 397 N.Y.S.2d 943, 950, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). As the Supreme Court observed in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974), "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." The Second Circuit has noted the Constitution's "bias toward unfettered speech at the expense, perhaps of compensation for harm to reputation" in situations involving public figures and topics of public interest which significantly affect political discourse. *Buckley v. Littell,* 539 F.2d 882, 889 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977).

The Supreme Court has long recognized the unique nature of political and religious speech.

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement.

*New York Times v. Sullivan, supra,* 376 U.S. at 271, 84 S.Ct. at 721, (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940)). The Second Circuit has found that significant safeguards are necessary to preserve the freedoms guaranteed by the First Amendment.

> These strict tests may sometimes yield harsh results. Individuals who are defamed may be left without compensation. But excessive self-censorship by publishing houses would be a more dangerous evil. Protection and encouragement of writing and publishing, however controversial, is of prime importance to the enjoyment of first amendment freedoms. Any risk that full and vigorous exposition and expression of opinion on matters of public interest may be stifled must be given great weight. In areas of doubt and conflicting considerations, it is thought better to err on the side of free speech.

*Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 (2d Cir.), *cert. denied sub. nom,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

The nature of an allegedly libelous statement as opinion or fact then is clearly crucial. Opinions, however rude, grating, obnoxious, or personally offensive, are simply not actionable.

The determination of whether a statement is fact or opinion is a question of law for the Court. *Davis v. Ross,* 754 F.2d 80, 85 (2d Cir.1985); *Rinaldi v. Holt, Reinhart & Winston, supra,* 42 N.Y.2d at 382, 366 N.E.2d at 1299, 397 N.Y.S.2d at 950. While it is clear that expressions of opinion are constitutionally protected, determining whether a particular statement is opinion or fact presents oftentimes nettlesome problems. Although the evanescent distinction may be "hazy at times," one federal court has suggested that "loosely definable, variously interpretable statements ... made inextricably in the context of political, social, or philosophical debate" are opinions, while statements "imputing objective reality, uncolored by possible interpretation or bias," are assertions of fact. *Ollman v. Evans,* 479 F.Supp. 292, 294 (D.D. C.1979), *aff'd,* 750 F.2d 970 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985) (quoting *Buckley v. Littell, supra,* 539 F.2d at 895). The court must inquire from the perspective of an "ordinary reader." *Buckley v. Littell, supra,* 539 F.2d at 894.

While the Second Circuit has formulated no precise test to distinguish actionable statements from protected opinions, recent decisions have outlined the most crucial considerations. When deciding whether a statement is fact or opinion, the court must first consider the context in which the statements are made and the circumstances surrounding the statements. The Court must consider as well whether the words of the statement itself are being used literally or figuratively and whether the statements can be proved objectively true or false. Finally, if the foregoing evaluation indicates a statement is opinion, the court should determine whether the opinion nevertheless implies the allegation of undisclosed defamatory facts as its basis. *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 225–26 (2d Cir.1985).[2]

### A. Statement Concerning Liberty Lobby

Following the *Mr. Chow* test, the Court will first consider the context and circumstances surrounding the first statement concerning Liberty Lobby itself. As noted above, Buckley published the statement that *"The Spotlight's* distinctive feature is racial and religious bigotry"* in his book *Overdrive: A Personal Documentary.* Buckley is a well known lecturer, a columnist syndicated in 350 newspapers, and the author of over twenty books, many of which have been best sellers. Buckley is the editor of *The National Review*, a leading publication of the conservative movement in America. As the Second Circuit wrote in *Buckley v. Littell, supra,* "[t]he substance of much of [Buckley's] writing and speaking is political. He may fairly be described as perhaps the leading advocate, idealogue or theoretician of conservative political beliefs and ideas." 539 F.2d at 886. Liberty Lobby is a Washington, D.C.-based not-for-profit corporation and self-described "citizens' lobby."[3] *Anderson v. Liberty Lobby, supra,* 106 S.Ct. at 2506.

The book studies Buckley's life from a uniquely political perspective. Entitled *Ov-*

---

**2.** The Second Circuit in *Mr. Chow* reached its result by applying a combination of the factors utilized by the Second Circuit in prior cases and factors outlined by the D.C. Circuit in *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) *(en banc ).* The factors noted by both courts largely overlap. The Court will apply the *Chow* analysis which broadly groups the various considerations as 1) context and circumstances 2) literal or figurative language 3) truth or falsity and 4) allegation of undisclosed defamatory facts.

**3.** Plaintiffs in this case do not deny that they are public figures. The standard for determining whether a person or corporate entity is a public figure is set forth in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). "[T]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures." *Id.* at 342, 94 S.Ct. at 3008. The Court also distinguished between those who are public figures for all purposes and those who are public figures in a more limited fashion:

> For the most part those who attain this status have assumed roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in

order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Id.* at 345, 94 S.Ct. at 3009.

Applying this public figure analysis to Liberty Lobby, Inc. and Willis A. Carto, it is clear that the plaintiffs are at least limited purpose public figures. As a political lobbying organization, there is no question that Liberty Lobby has thrust itself into the forefront of a variety of public controversies. By publishing a newspaper of national circulation, Liberty Lobby also invites attention and comment. The Second Circuit in *Liberty Lobby Inc. v. Pearson,* 390 F.2d 489, 491 (1968), observed, "[t]he express purposes and the admitted activities of Liberty Lobby—political lobbying and dissemination of information on highly controversial subjects—render its affairs a matter of public interest." Similarly, as the founder and chairman of Liberty Lobby and a man generally in the public eye, Carto is also a public figure. The Supreme Court in *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2509 n. 3, 91 L.Ed.2d 202 (1986), accepted the district court's conclusion that Liberty Lobby and Carto were limited purpose public figures.

The importance of free speech in our society is reflected by the very high burden placed upon a plaintiff in a libel case. When a public figure sues for defamation, the first amendment bars recovery unless the defamatory falsehood was

*erdrive: A Personal Documentary,* it is an autobiographical description of a typical week in Buckley's life. Buckley wrote the book in the first person tracing his daily life, including particularly his correspondence, thoughts, and conversations. Each statement in the book is filtered through Buckley's perspective of the events which occur during the week being described.

The paragraph at issue in this lawsuit indicates a history of public exchange between Buckley and Liberty Lobby. Thus, Buckley's belief that the distinctive feature of *The Spotlight* is racial and religious bigotry results from an exchange in the political arena where the "widest latitude for debate in the interests of the First Amendment must be furnished." *Buckley v. Littell, supra,* 539 F.2d at 889.

Moreover, the fact that Liberty Lobby forcefully presents a particular political view supports the conclusion that Buckley's book is protected political debate. By zealously advocating particular positions in its publication, Liberty Lobby opens itself up to criticism from those who believe differently. Neither an organization nor a person who sallies forth to espouse a specific creed or conviction can resort to the courts to silence those who disagree with that viewpoint.[4] Litigation, as Mr. Buckley himself has found out, is both an inappropriate, and because of the First Amendment protections, an ineffective way to rebut ideas.[5]

■ Turning to the second and third *Mr. Chow* factors, an examination of the specific language of the allegedly libelous statement likewise warrants the conclusion that the statement is opinion. What constitutes the "distinctive feature" in a publication is a matter of emphasis or subjective perception rather than one of fact. The different individuals who read *The Spotlight* undoubtedly have different perspectives about what constitutes the publication's "distinctive feature." In addition, the general terms "racial and religious bigotry" are imprecise concepts which cannot be proven true or false as statements of fact. As explained by the *Buckley* court, words that convey concepts "whose content is so debatable, loose and varying, that they are insusceptible to proof of truth or falsity" are considered statements of pure opinion absolutely protected by the First Amendment. *Buckley v. Littell, supra,* 539 F.2d at 894. The court's involvement in ascertaining the meaning Buckley's statement conveys would transport it into "the area of opinion as opposed to factual assertion." *Buckley v. Littell, supra,* 539 F.2d at 892. This applies to the statement at issue. There is no one opinion of what constitutes "racial and religious bigotry," or for that matter what constitutes "bigotry" generally. Thus, the statement that *The Spotlight's* distinctive feature is racial and religious bigotry provides no objective criteria by which its truth or falsity can be evaluated. In such situations, the Second Circuit has protected even arguably unreasonable opinions. "An assertion that cannot be proved false cannot be held libellous. A writer cannot be sued for simply expressing his opinion of another person, however

---

made with actual malice—defined as either knowledge of falsity or reckless disregard for the truth. *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 342–43, 94 S.Ct. at 3008. Moreover, the Supreme Court has recently stated that to withstand a motion for summary judgment, the plaintiff must establish with "convincing clarity" that the statements were made with actual malice. *Anderson v. Liberty Lobby, Inc., supra,* 106 S.Ct. at 2515. Because the Court holds that the statements in question are protected opinion, the issue of whether plaintiff has shown actual malice with convincing clarity need not be reached.

**4.** See discussion of *Buckley v. Littell, infra.*

**5.** Liberty Lobby has brought similar suits against others who have publicly disagreed with its views, including the Anti-Defamation League of B'nai Brith, columnist Jack Anderson, the late Drew Pearson, and most recently, Dow Jones & Company, publishers of the Wall Street Journal. Liberty Lobby has not fared particularly well in any of these suits. *See, e.g., Anderson v. Liberty Lobby, Inc., supra,* 106 S.Ct. 2505; *Liberty Lobby, Inc. v. Drew Pearson, supra,* 390 F.2d 489; *Liberty Lobby Inc. v. Dow Jones & Company, supra.* Dow Jones & Company has made an application under Rule 11, Fed.R.Civ.P. to recover the $300,000 it has expended in defending the libel action.

unreasonable the opinion or vituperous the expressing of it may be." *Hotchner v. Castillo-Puche, supra,* 551 F.2d at 913. Because the terms used by Buckley are so "debatable, loose and varying," that they are not susceptible to truth or falsity, it is clear that Buckley has stated a constitutionally protected opinion whose truth may be debated, but cannot be denied. *Buckley v. Littell, supra,* 539 F.2d at 894.

A variety of other courts have found similar statements made in analogous contexts to be protected opinions. In *Buckley v. Littell, supra,* Buckley himself was precluded by the same doctrine from suing author Franklin M. Littell who had labeled him a "fellow traveler of fascism" and a "deceiver" because he allegedly used his journalistic position to spread materials from "openly fascist journals" under the guise of responsible conservatism. 539 F.2d at 894. The Second Circuit found Littell's commentary to be protected opinion and therefore not actionable. The court observed that the statement labeling Buckley "a fellow traveler of fascism," had a "tremendous imprecision" in both meaning and usage. *Id.* at 893. The court also found that what constituted an "openly fascist" journal was as much a matter of opinion as is "the question what constitutes 'fascism' or the 'radical right.'" 539 F.2d at 895. The view that the "distinctive feature" of a magazine is "racial and religious bigotry" can be no less a protected opinion than Littell's statement that Buckley is a "fellow traveler of fascism" spreading materials from "openly fascist journals."

The district court in *Liberty Lobby v. National Review,* No. 79–3445, slip op. at 10 (D.D.C. April 20, 1983), took a similar position. In that case, the court found that an article appearing in the National Review that called the Liberty Lobby "a hotbed of anti-Semitism" fell "within the realm of protected opinion". *Id.* at 7. In analyzing the language, the court pointed out that it was impossible to determine how much anti-Semitism justifies the label "a hotbed" and, more importantly for the purposes of this case, that the term anti-Semitism itself was too imprecise to be defined. *Id.* at 10.

The court concluded that to "impose such requirements of proof and measure upon statements of opinion would stultify the right of free speech protected by the first amendment to the Constitution." *Id.* In reaching this conclusion, the court relied upon *Holy Spirit Association for Unification of World Christianity v. Sequoia Elsevier Publishing Co., Inc.,* 75 A.D.2d 523, 524, 426 N.Y.S.2d 759, 760 (1st Dept.1980). That case concerned a published statement that had charged the plaintiff with being "a theological-political instrument, combining elements of Manicheism, *Nazi-style anti-Semitism,* Calvinism, and the most discredited aspects of pre-Reformation Roman Catholicism." The New York court, relying upon *Gertz v. Robert Welch, supra,* specifically found that the statement was a protected statement of opinion. *Id. See also Liberty Lobby v. Dow Jones & Company,* 638 F.Supp. 1149 (D.D.C.1986) (calling Liberty Lobby "anti-Semitic" is "probably constitutionally protected opinion," but even if it is a fact, the statement is true); *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (statements in newspaper article accusing plaintiff of being a "political Marxist," a "political activist," and a "pamphleteer" entitled to absolute first amendment protection as expressions of opinion).

■ Applying the *Mr. Chow* factors, the circumstances in this case indicate that one public figure is suing another public figure for allegedly defamatory statements that appear in a book where the context of the publication indicates that the challenged statement represents a heated clash of political wills. Having examined the specific language of the statement, the Court finds that the literal terms utilized by Buckley undoubtedly represent a subjective judgment incapable of being objectively proven true or false. Inasmuch as the foregoing analysis indicates that the statement is opinion, the Court must apply the final *Mr. Chow* consideration. Turning to this final factor, the Court finds no evidence to indicate that Buckley's opinion was based on a "clear but false implication" that he was "privy to facts" about *The Spotlight* "that

are unknown to the general reader." *See Davis v. Ross, supra,* 754 F.2d at 85–86 (quoting *Hotchner v. Castillo-Puche, supra,* 551 F.2d at 913). For all these reasons, the statement in question is one of protected opinion and therefore no action for libel can lie.

### B. *Statement Concerning Willis Carto*

Applying the *Mr. Chow* test to the second statement directs the same conclusion; it, too, is protected opinion. The statement that "... Carto having attacked me [Buckley] and 'National Review' for years, presumably upon learning that we thought the Protocols of the Learned Elders of Zion a forgery" appears along with the first statement in the same paragraph of Buckley's book. The Court's observations in regard to the context and circumstances of the first statement, the first *Mr. Chow* factor, thus apply equally to this second statement.

■ Applying the second and third *Mr. Chow* factors, the Court determines that the statement, even taken literally, is nonactionable opinion and that it is incapable of being proven true or false. Even assuming *arguendo* that the average reader would draw from Buckley's reference to the Protocols of the Learned Elders of Zion the literal impression that Carto and Liberty Lobby are anti-Semitic,[6] such statement, is nonetheless constitutionally protected opinion.[7] *See Liberty Lobby v. National Review, supra,* slip op. at 10; *Holy Spirit Association v. Sequoia Elsevier Publishing Co., Inc., supra,* 426 N.Y.S.2d at 760. Even if the term anti-Semitic was not opinion per se, this Court, applying the second

and third *Mr. Chow* factors, would still find the challenged statement to be protected opinion. Crucial to the determination that the statement is opinion is Buckley's very use of the word "presumably" to modify his explanation of Carto's motives in attacking him. By using "presumably," Buckley underlines his uncertainty as to whether Carto has criticized him for his views on the authenticity of the Protocols of the Learned Elders of Zion. The acknowledgment of uncertainty renders Buckley's statement incapable of being proven true or false. *See Buckley v. Littell, supra,* 539 F.2d at 894.

The Court in *Korkala v. W.W. Norton & Company,* 618 F.Supp. 152 (S.D.N.Y.1985) reached a similar conclusion on analogous language and granted defendant summary judgment. *Korkala* involved a New York gunrunner named in a book concerning international arms trade who brought a libel action against the publishers, editors, and author of the book. One of the allegedly libelous statements describes a raid by New Jersey police on the headquarters of Amstech Corporation in New Jersey. Amstech, the book explains, "was George Korkala's [the plaintiff's] export company, *though it is probable* that the real owner was Frank Terpil." 618 F.Supp. at 154 (emphasis added). Korkala claimed that this statement injured his ability to earn a livelihood as he is the complete owner of the company. Although expressing some skepticism, the court assumed *arguendo* that the statement was damaging for the purposes of the analysis.

---

**6.** To reach such a conclusion, the average reader would have to first be aware of the content and history of the Learned Protocols of the Elders of Zion, would then have to infer that those who believe in the truth of the Learned Elders of Zion are anti-Semitic, and would finally have to infer that Carto's attack on Buckley and the National Review means that Carto believes the Protocols are true and thus, Carto is anti-Semitic. The Court observes that to draw the ultimate conclusion that Carto is anti-Semitic, the average reader would have to follow this extensive series of inferences. Thus, the average reader actually might not have been aware

that the statement potentially implied that Carto is anti-Semitic.

**7.** In examining the specific language chosen by Buckley, it is obvious that the word "attacked" would be interpreted by the average reader to mean "criticized" as opposed to a literal definition of a physical assault, which might imply criminal conduct and could be found to be defamatory. Buckley's use of hyperbole does not render an otherwise protected statement somehow actionable. *Mr. Chow of New York v. Ste. Jour Azur S.A., supra,* 759 F.2d at 228.

[b]ut even assuming the statement is damaging (and false), it is not actionable. That is because the reference to Amstech as "George Korkala's export company, though it is probable that the real owner was Frank Terpil" is an expression of opinion, and expressions of opinion are constitutionally protected.

618 F.Supp. at 156 (citing *Mr. Chow of New York v. Ste. Jour Azur S.A., supra,* 759 F.2d at 223.) In *Wynberg v. National Enquirer, Inc.,* 564 F.Supp. 924 (C.D.Cal. 1982), the court examined defendant's statement that "I suspect the real total [of money plaintiff improperly obtained from Elizabeth Taylor] was even more" than the amount made public. Evaluating this statement, the court held it to be "an expression of [the author's] feeling which is not defamatory". *Id.* at 926.

■ The phrase "presumably," similar to the phrases "I suspect" and "it is probable," expresses Buckley's constitutionally protected belief or opinion. A statement phrased in a manner that its truthfulness can never be determined, as here, is opinion. Even were the Court able to discern the actual reason for Carto attacking Buckley, Buckley's statement is still not false; it is just an opinion.

■ Having found that the second statement is also opinion, the Court must apply the final *Mr. Chow* factor. By using the terminology "presumably," Buckley acknowledges that he is unsure of why Carto has criticized him. Since Buckley openly admits that he does not really know the reason for Carto's attack, this Court finds that the statement cannot be reasonably understood to imply the existence of undisclosed defamatory facts as its basis. As such, Buckley's opinion is entitled to constitutional protection.[8]

## II. *Rule 11 Sanctions*

Having completed an extensive analysis of the challenged statements, and finding the plaintiffs' position entirely lacking in merit, the Court would pause to remind plaintiffs that Rule 11 exists to prevent such frivolous and unfounded litigation. While the defendants in this case did not request that Rule 11 sanctions be awarded, had such a motion been made, it would certainly have been entertained.

Rule 11, Fed.R.Civ.P. reads in relevant part,

The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The language of the rule, which was amended in 1983, is strikingly different from the words of its predecessor. No longer is it sufficient for an attorney to claim that he acted in good faith or that he personally was unaware of the groundless nature of a claim. Rather, the language of Rule 11 "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Eastway Const. Corp. v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985).

■ Had plaintiffs' attorney made such an inquiry in this case, he would have realized that under *Buckley v. Littell, supra,* 539 F.2d 882, and *Liberty Lobby v. National Review, supra,* plaintiffs stood no chance of succeeding. As recently noted by the Second Circuit, "[n]o litigant has the right to monopolize judicial resources and thus indirectly to obstruct other litigants asserting good faith claims." *In re Martin-Trigona,* 795 F.2d 9, 12 (2d Cir.1986). This Court, however, must apply Rule 11 so

---

**8.** Inasmuch as no libel was committed, Doubleday, the publisher of the book, also cannot be held liable.

that "any and all doubts must be resolved" in favor of the plaintiffs. *Eastway Const. Corp. v. City of New York, supra,* 762 F.2d at 254. Thus, sanctions will not be awarded here because Rule 11 was newly revised and lacked precedent when plaintiffs filed the present action and because the defendants have not requested sanctions. For suits filed subsequent to this one, these considerations may well not be applicable. It is clear that, at least from this point on, the plaintiffs should be considered to be on notice of the law in this area and if additional frivolous suits are filed, courts should not hesitate to impose monetary sanctions.

## CONCLUSION

The statements appearing in *Overdrive: A Personal Documentary* are constitutionally protected expressions of opinion. Accordingly, the Court grants defendants' motion for summary judgment and dismisses the action with costs.

It is so ordered.