**LIBERTY LOBBY, INC., Appellant,**

v.

**DOW JONES & COMPANY, INC., et al.**

**No. 86–7017.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1987.

Decided Feb. 5, 1988.

Mark Lane, Washington, D.C., for appellant.

Robert P. LoBue, New York City, for appellees.

Before EDWARDS, BORK, and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

This is a libel action in which Liberty Lobby, Inc., a citizens' group, seeks fifty million dollars in compensatory and punitive damages from the publisher of *The Wall Street Journal*. After more than a year of discovery, the district court granted

defendants' motion for summary judgment on the first count, and judgment on the pleadings as to the remaining four counts of Liberty Lobby's complaint. We affirm the district court's disposition of the case in all respects, although we sometimes follow a different route to the same result.

**I.**

On September 28, 1984, *The Wall Street Journal* published a column entitled "Controversial Publisher—Racial Purist Uses Reagan Plug." Appendix to Complaint, E.N. 1 (filed Nov. 15, 1984) [hereinafter "Complaint"]; [1] Wall St. J., Sept. 28, 1984, at 56, col. 1. The article, written by defendant Rich Jaroslovsky, a ten-year veteran of *The Journal*'s news staff, bore the logo "Politics 84," and was published as part of *The Journal*'s coverage of the 1984 presidential campaign. The article is reprinted in its entirety as Appendix A to this opinion. The article states that one Roger Pearson, an advocate of racial betterment through genetic selection, had received a letter of commendation from President Reagan and that he had exploited the letter to promote his controversial publications. According to the story, the letter was composed by a Pearson associate on the White House staff, and President Reagan had never met Mr. Pearson. Jaroslovsky concluded that the incident demonstrated "how a highly ideological presidency—conservative or liberal—can be used by well-connected outside activities to gain respectability."

In the course of discussing Pearson's past activities and associations, the article asserted:

Other Pearson writings appeared in Western Destiny, a magazine published by the far right, anti-Semitic Liberty Lobby. Mr. Pearson edited Western Destiny briefly in the mid–1960s and wrote several books on race and eugenics that were issued by Liberty Lobby's publishing arm. These pamphlets are still

---

1. Neither party to this appeal has prepared an appendix, an omission that has caused unnecessary work for the court. We will cite record documents by their Entry Number ("E.N.") on the district court docket sheet and their date of filing with that court. Where a record document is also available in a published source, we will cite that source as well.

sold by the National Socialist White People's Party, the Arlington, Va. based American Nazi group; Mr. Pearson says he doesn't have any connection with that group.

App. A, *infra*, p. 1304.

On November 15, 1984, Liberty Lobby filed a complaint for libel in the United States District Court for the District of Columbia, basing jurisdiction on diversity of citizenship under 28 U.S.C. § 1332 (1982). Complaint ¶ 1. Named as defendants were Dow Jones & Co., Inc., the company that publishes *The Journal,* and Rich Jaroslovsky, the author of the Pearson article. *Id.* ¶¶ 2–3.

Liberty Lobby claims that the quoted passage is false and defamatory in two respects. First, although Liberty Lobby admits to being an anti-Zionist organization, it claims that *The Journal* 's characterization of it as "anti-Semitic" is false and injurious to its reputation. Complaint ¶ 10. Second, Liberty Lobby contends that it never published the magazine, *Western Destiny;* nor did it issue any books by Mr. Pearson. *Id.* It further contends that no books or pamphlets issued by Liberty Lobby are or were sold by the National Socialist White People's Party. *Id.*

In November, 1985, after eleven months of voluminous discovery had been completed, Liberty Lobby sought and was granted leave to amend its complaint to add four additional causes of action for libel against Dow Jones. *See* Motion for Leave to Amend and Supplement the Complaint, E.N. 46 (filed Nov. 1, 1985). These claims were based upon a column entitled "There's Nothing Like a Libel Trial for an Education" which appeared in the editorial section of *The Wall Street Journal* on October 11, 1985. *Id.* exh. B; Wall St. J., Oct. 11, 1985, at 28, col. 3. The column was written by Ms. Suzanne Garment, a member of *The Journal's* editorial staff, and is reprinted in its entirety as Appendix B to this opinion.

Using as a vehicle the trial of another libel action, one between Liberty Lobby and *The National Review,* a magazine of opinion, the column gave the author's views "about libel suits in general and their place in democratic politics." In introducing its theme, the Garment column noted that Liberty Lobby's claim based on the Jaroslovsky article was at that time pending before the district court, stating:

> Over the years, Liberty Lobby and Mr. Carto have sued a number of publishers that called them racist and anti-Semitic. Still pending is a Liberty Lobby suit against The Wall Street Journal, which last year called Liberty Lobby "anti-Semitic". and reported that it had published various tracts by a promoter of racial betterment through genetic selection.

App. B, *infra*, at 1305. This republication of allegedly defamatory material from the Jaroslovsky story forms the basis for Liberty Lobby's second cause of action.

The body of the Garment column discussed Liberty Lobby's trial strategy in defending a counterclaim for libel brought against it by *The National Review.* The column described in detail the courtroom scene prior to the delivery of opening arguments to the jury. It noted the presence of "a good-looking black female lawyer" at Liberty Lobby's counsel table with Mr. Lane, the lead counsel, and went on to state, "[t]he moment the jury filed in—all black, as is not uncommon in the District— you began to suspect that Mr. Lane might have something in mind." The column then summarized Liberty Lobby's opening argument to the jury, at one point quoting Mr. Lane as saying:

> If you read the words of Adolf Hitler regarding superior races and advanced races and inferior races, you will have difficulty separating the words of Mr. Buckley in his editorials in the National Review from the words of Adolf Hitler.

App. B, *infra*, p. 1306. The column summed up its discussion of Liberty Lobby's trial strategy by stating:

> So we see the Liberty Lobby standing up in court and calling Mr. Buckley racist, most likely calculating that black jurors will be too hypnotized by this possibility to consider other facts important. This is not just an ordinary lawyer's trick. This is breathtaking in its daring.

Most of us would be embarrassed to appeal to a racial or religious minority audience so crudely. We know the Fair Play Patrol would at once swoop down and cart us away. But the Carto team is of sterner stuff, able to put its head down and go for broke.

*Id.* at 1306.

The column questioned the utility of highly inflammatory libel suits in a democratic society, and compared "Louis Farrakhan wowing them at Madison Square Garden" to "Mark Lane in front of the jury." The statements in the Garment column concerning Liberty Lobby's conduct during *The National Review* trial form the basis for its third, fourth and fifth causes of action for libel against Dow Jones.

On December 16, 1985, appellees filed a motion for summary judgment on the first cause of action based on the Jaroslovsky article, and for judgment on the pleadings as to the four claims based on the Garment column. Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment and Judgment on the Pleadings, E.N. 57 (filed Dec. 16, 1985).

On July 10, 1986, the district court issued its memorandum opinion and order, granting appellees' motions and dismissing Liberty Lobby's complaint with prejudice. *See Liberty Lobby, Inc. v. Dow Jones & Co.,* 638 F.Supp. 1149 (D.D.C.1986). The district court found that the truth or falsity of *The Journal's* statements concerning Liberty Lobby's publishing activities was "immaterial," for, even if false, they were not "defamatory in the least of Liberty Lobby but for the ... characterization of the entire conglomerate as 'anti-Semitic.'" *Id.* at 1152. On the latter score, the district court "suspect[ed] ... that the term 'anti-Semitic,' as Jaroslovsky has used it, is probably constitutionally protected opinion." *Id.* (citing *Ollman v. Evans,* 750 F.2d 970, 974–84 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985)). However, the district

court went on to hold that, to the extent the charge of anti-Semitism had any objectively verifiable factual content, the statement was substantially true. *Id.* Relying upon the contents of a multivolume file Liberty Lobby kept on publications about Jews [2] and upon the views expounded in Liberty Lobby's official organ, *The Spotlight,* the district court found that appellees' "evidence of Liberty Lobby's institutional anti-Semitism in its most malign sense" was "compelling." *Id.* With only the bald denial of the affidavit of Willis Carto, Liberty Lobby's founder and chief executive officer, weighing against appellees' evidence, the district court concluded that no reasonable jury could find by a preponderance of the evidence that the ascription of anti-Semitism to Liberty Lobby was false. *Id.* at 1153.

The district court also found that dismissal of Liberty Lobby's claims based on the Jaroslovsky article was mandated by the complete lack of evidence that any of the allegedly defamatory statements were published with actual malice. The court noted that Jaroslovsky had spent three months on intermittent research, had reviewed a large number of Liberty Lobby documents, and had consulted various articles about Liberty Lobby. Jaroslovsky had shown these materials to his editor, who concurred in his judgment that Liberty Lobby was anti-Semitic. *The Journal's* Washington bureau chief, who was familiar with Liberty Lobby's radio program and its official publication, *The Spotlight,* agreed. The district court concluded that no reasonable jury could find that *The Journal* had acted with knowledge of falsity or reckless disregard of the truth, "there being no evidence of [actual malice] at all, much less proof that is clear and convincing." *Liberty Lobby,* 638 F.Supp. at 1153.

Turning to the Garment column's reference to the Jaroslovsky article, the district court found that this claim was "extinguished by the demise of Count I." *Liberty Lobby,* 638 F.Supp. at 1153. In the

---

**2.** On appeal, Liberty Lobby vigorously attacks the characterization of its research file on the Jewish religion as anti-Semitic. *See* Brief of Liberty Lobby at 18–20. Given our disposition of Liberty Lobby's claims based upon the allegation of anti-Semitism, *see infra* pp. 1297–98, we need not address the issue.

alternative, the court held that the "republication" was shielded by the common law privilege accorded to fair and accurate accounts of official reports and records. *Id.*

The remainder of the Garment column was, in the district court's view, "simply descriptions of Garment's personal reactions to Liberty Lobby's attorney's opening statement, nothing more." *Liberty Lobby*, 638 F.Supp. at 1154. Even assuming Liberty Lobby's charges of bias or vindictiveness were true, Garment's comments on *The National Review* trial were, in the lower court's view, expressions of opinion entitled to absolute first amendment protection. *Id.*

## II.

Under Fed.R.Civ.P. 56(c), summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The motion requires the court to look behind the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial. The Supreme Court recently reaffirmed these principles:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). *See First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (1983). The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c).

■ Where a public figure, which Liberty Lobby concedes that it is, or a public official pursues a libel action, first amendment requirements supplant both the common law of defamation and the normal standards of appellate review in several respects. First, such a plaintiff must demonstrate by at least a fair preponderance of the evidence that the allegedy defamatory statement is false. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775–78, 106 S.Ct. 1558, 1563–65, 89 L.Ed.2d 783 (1986); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL–CIO v. Austin*, 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974) ("Before the test of recklessness or knowing falsity can be met, there must be a false statement of fact."); *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed. 2d 125 (1964) ("[A] public official [is] allowed the civil [defamation] remedy only if he establishes that the utterance was false.").

■ This requirement is fully applicable at the summary judgment stage. Thus, where a district court concludes upon motion or its own initiative (after proper notice) that no reasonable jury could find by a fair preponderance of the evidence that the statement complained of is false, summary judgment for the defendant should be granted. Where the question of truth or falsity is a close one, a court should err on the side of nonactionability. *See Hepps*, 475 U.S. at 776, 106 S.Ct. at 1563.

■ Second, a public figure or official must demonstrate by clear and convincing evidence that the defendant published the defamatory falsehood with "actual malice," that is, with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). To support a libel judgment, there must be evidence which establishes in convincing fashion "that the defendant in fact entertained serious doubts as to the truth of his publica-

tion." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Through the defendant's own actions or statements, the dubious nature of his sources, the inherent improbability of the story or other circumstantial evidence, the plaintiff must demonstrate that the defendant himself entertained a "high degree of awareness of ... probable falsity." *Garrison,* 379 U.S. at 74, 85 S.Ct. at 216. This requirement, too, is applicable when considering a motion for summary judgment. The question for the court is "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986).

■ Finally, statements of opinion or belief are nonactionable as a matter of law. *See Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 504, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984) ("Under our Constitution 'there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.'") (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974)). The absolute protection accorded statements of opinion stems, in part, from plaintiff's burden of proving falsity, a component of which is proving that a statement is amenable to disproof. But as the language of *Gertz* suggests, the rule has independent roots in the limitations which the first amendment places on the intrusion of any branch of government, including Article III courts, into the marketplace of ideas.

■ First amendment concerns also affect a court's posture in reviewing the evidence presented on summary judgment. Normally, the evidence presented upon a

motion for summary judgment is construed in favor of the party opposing the motion. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (1983). As to the nonconstitutional issues in a libel action, this standard still obtains. However, where the constitutional prerequisites of falsity and actual malice are at issue "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the filed of free expression.'" *Bose,* 466 U.S. at 499, 104 S.Ct. at 1958 (quoting *New York Times,* 376 U.S. at 284–86, 84 S.Ct. at 728–29). While *Bose* and prior cases involved appellate review of trial verdicts in libel actions, logic and considerations of judicial administration dictate that the same level of review apply to the granting of summary judgment. *See Herbert v. Lando,* 781 F.2d 298, 308 (2d Cir.) (applying *Bose* independent review to summary judgment for media defendant), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986); *accord Bartimo v. Horsemen's Benevolent & Protective Ass'n,* 771 F.2d 894, 894–98 (5th Cir.1985), *cert. denied,* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986); *Hardin v. Santa Fe Reporter, Inc.,* 745 F.2d 1323, 1326 (10th Cir.1984).

We turn to an analysis of the statements at issue and the district court's rulings.

## A.

Unlike the district court, we think Jaroslovsky's statements concerning Liberty Lobby's publishing activities have defamatory content independent of the charge of anti-Semitism. Under District of Columbia law,[3] a statement is defamatory, "if it tends to injure plaintiff in his trade, profes-

---

3. All parties to this diversity suit agree that the common law of the District of Columbia governs this action. Liberty Lobby, a Washington-based advocacy group, alleges substantial circulation of the allegedly defamatory material in the District. *See* Complaint ¶ 2. *See also Dowd v. Calabrese,* 589 F.Supp. 1206, 1210 (D.D.C.

1984) (Under District of Columbia conflict of law principles, law to be applied in defamation action is not that of forum where offending publication was prepared, but place where the plaintiff suffered the most significant harm to reputation.).

sion or community standing, or lower him in the estimation of the community." *Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C.1984) (citation omitted). "It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *Levy v. American Mut. Ins. Co.*, 196 A.2d 475, 476 (D.C.1964). *See Afro–American Publishing Co. v. Jaffe*, 366 F.2d 649, 654 n. 10 (D.C.Cir.1966) (citations omitted).

■ Here, *The Journal* article by Jaroslovsky indicated that Liberty Lobby had published Pearson's theories of racial supremacy and genetic selection, and that these publications were sold by an American Nazi organization. A jury could find that such an allegation, standing alone, tended "to lower [Liberty Lobby] in the estimation of the community or to deter third persons from dealing or associating with [Liberty Lobby]." *Restatement (Second) of Torts* § 559 (1977); *see also id.* illustration 2 (An allegation of membership in the Ku Klux Klan is defamatory.). We have little doubt that a District of Columbia court would find that the allegation of this type of publishing activity has sufficient defamatory content to go to a jury. *See Afro–American Publishing*, 366 F.2d at 655 (charge that plaintiff store owner cancelled his subscription to black magazine for racist motives and made derogatory statements about black customers could support libel verdict).

■ We find, however, that these statements about Liberty Lobby's publishing activities are nonactionable as a matter of federal constitutional law for two reasons. First, we are convinced that no reasonable jury could find by a fair preponderance of the evidence that these statements are false. Second, even if a jury could find that the Jaroslovsky article falsely exaggerated the connection between Liberty Lobby and Pearson's writings, there is ab-

solutely no evidence that the statements were made with "a high degree of awareness of ... probable falsity." *Garrison*, 379 U.S. at 74, 85 S.Ct. at 216.

**1.**

It is undisputed that both *Western Destiny* and the Pearson books mentioned in the Jaroslovsky article were published by an unincorporated entity located in Torrance, California, doing business as The Noontide Press. *See* Affidavit of Robert P. LoBue, E.N. 57, ¶ 85 (filed Dec. 16, 1985) [hereinafter "LoBue Aff."].[4] The record evidence that both Mr. Carto and Liberty Lobby exercise substantial financial and editorial control over the publishing activities of Noontide is, in our view, compelling.

In their first set of interrogatories, appellees asked Liberty Lobby to:

state whether plaintiff or any of its officers or directors or their spouses controls or ever has controlled, in whole or in part, directly or indirectly, formally or informally, any aspect of the business or publishing activities or operations or the editorial policy or decision-making of The Noontide Press.

Defendants' First Set of Interrogatories to Plaintiff, E.N. 6, at 13 (filed Dec. 26, 1984). In an answer sworn to by Mr. Carto, the appellant responded in the affirmative and went on to indicate that Mr. Carto had acted in an "advisory capacity" to Noontide for the last twenty years. Plaintiff's Answer to Defendants' First Set of Interrogatories, E.N. 9, at 17 (filed Feb. 28, 1985). In deposition testimony, Mr. Carto admitted that he was the central figure in the establishment of Noontide Press and had chosen its name. Deposition of Willis A. Carto, E.N. 41, at 400–01 (filed Oct. 4, 1985) [hereinafter "Carto Dep."]. Noontide's nominal director, Mr. Thomas Marcellus, testified that Mr. Carto exercises considerable control over the selection of the books that Noontide will publish. *See* LoBue Aff. ¶ 62 (quoting Deposition of Thomas Marcellus at 116). In support of their dispositive

---

**4.** Mr. Robert LoBue is counsel of record for Dow Jones in this action. His affidavit, filed in support of appellees' motion for summary judg-

ment, was used as a vehicle to summarize and organize the documentary material upon which appellees relied below.

motion, appellees also introduced the sworn testimony of Mr. Robert M. Bartell, a member of Liberty Lobby's Board of Policy until 1984. *See* LoBue Aff. ¶ 60. In this testimony, given in an unrelated action involving Liberty Lobby, Mr. Bartell described Noontide's publishing activities as follows:

> a pamphlet or a book of some kind was run through Liberty Lobby's executive staff for reading, for approval, for changes, for whatever.... And the finished copy is then given back to Mr. Carto and it goes back to California and is published by Noontide Press, and this has been going on for years and years and years, then [Mr. Carto] doesn't have to say that I am Noontide Press although we all know he is.

*Id.* (quoting Deposition of Robert M. Bartell at 46–47, filed in *Mermelstein v. Institute for Historical Review,* No. C 356 542 (Cal.Super.Ct.)).[5]

Until a fire in 1984, Liberty Lobby and The Noontide Press shared office space in Torrance, California. *See* Carto Dep. at 474. During the 1960's, when the Pearson books were published, Mr. Carto was a board member of The Legion, the incorporated entity behind Noontide Press. *See* Carto Dep. at 300–03. Mr. Bruce Hollman, a Liberty Lobby director, also sat on The Legion's board at the time of the publications at issue. *See id.* at 301. At the same time, Mr. Robert Kuttner, listed as a contributing editor of *Western Destiny,* was also a member of Liberty Lobby's Board of Directors. *Id.* at 12C. During this time, Roger Pearson was the editor of *Western Destiny,* and Mr. Carto, under the pseudonym "E.L. Anderson," was its sole associate editor. *See* Plaintiff's Answer to Defendants' First Set of Interrogatories, E.N. 9, at 15 (filed Feb. 28, 1985) (admitting that "E.L. Anderson" is a pseudonym for Mr. Carto).

The Legion's application to do business as Noontide Press is signed by Mrs. Elizabeth Carto, Mr. Carto's wife, and a supervisor at Liberty Lobby. *See* LoBue Aff. ¶ 46 (citing Deposition of Thomas Marcellus, exh. 15). The application also lists Bruce Hollman as one of Noontide's principals, himself a Liberty Lobby director. *Id.* Mr. Carto has personally chosen the only two directors of Noontide, and they received their positions by contacting Liberty Lobby through *The Spotlight.* LoBue Aff. ¶¶ 52–54. The record also indicates that The Noontide Press advertises only in Liberty Lobby's official organ, *The Spotlight.* LoBue Aff. ¶ 76 (citing Marcellus Deposition at 69–70). In return, Liberty Lobby purchases almost half of the books for its "Liberty Library" from Noontide. *See* LoBue Aff., exh. 17. Appellees have also adduced evidence that Liberty Lobby provides substantial financial support to The Legion and Noontide. *See* LoBue Aff. ¶ 77.

Upon this record, we have little difficulty in concluding that both *The Journal's* characterization of Noontide as Liberty Lobby's "publishing arm" and its statement that Liberty Lobby "published" *Western Destiny* are substantially true.[6] Given the substantial ties between Mr. Carto, Liberty Lobby and Noontide, we are convinced

---

**5.** Both Noontide Press and the Institute for Historical Review ("IHR") are trade names for an incorporated entity known as The Legion for the Survival of Freedom, Inc. ("The Legion"). In *Mermelstein,* the plaintiffs brought suit against Liberty Lobby, The Legion, Noontide, the IHR and Mr. Carto, among others. The suit was based upon the IHR's offer of a $50,000 reward to anyone who could prove that the Holocaust had actually occurred. The offer received extensive publicity in Liberty Lobby's publications. *See* LoBue Aff. ¶¶ 218, 220. The *Mermelstein* plaintiffs evidently submitted such proof and claimed the reward. Upon the IHR's refusal to honor its offer, the plaintiffs instituted an action for breach of contract and intentional infliction of emotional distress. *See* LoBue Aff., exh. 14 (transcript of proceedings in *Mermelstein v. Institute for Historical Review,* No. C 356 542 (July 22, 1985). The case was settled with the defendants, including Liberty Lobby, agreeing to publish a formal apology and to pay the plaintiffs $150,000 in damages. *See* LoBue Aff., exh. 14, at 4–13.

**6.** Other news organizations have apparently reached this conclusion as well. In reporting on the activities of The Legion, *The Los Angeles Times* referred to "the publishing arm of the Carto operations known as Noontide Press." Carto Dep., exh. 88; The Los Angeles Times, May 3, 1981, at 12, col. 1.

that Liberty Lobby could not demonstrate by a fair preponderance of the evidence that these statements are false.

In *Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir.) (en banc), *cert. denied,* —— U.S. ——, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987), *The Washington Post* ran a story charging that the President of Mobil Oil Corp., William Tavoulareas, had "set up" his son Peter in a shipping company which did substantial business with Mobil. Both father and son sued in libel, claiming that the "set-up" allegation was false and defamatory. In fact, Atlas Shipping, the company Peter Tavoulareas was associated with, dealt only with Samarco, a Saudi/Mobil joint venture. 817 F.2d at 767–68. The Tavoulareases claimed that the article created the false and defamatory impression that there was a "direct link" between Mobil and Atlas. *Id.* at 787.

Reviewing the record, this court found that Mobil's and the elder Tavoulareas' links with Atlas were substantial and palpable, although in no way formalized. Mobil had recruited the first head of Atlas Shipping, had provided it with ships and office space, and had even supplied it with an interim manager when its most senior executive departed. *Tavoulareas,* 817 F.2d at 787. Under these circumstances, the court held that "even if *The Post* article failed to make clear the formal, corporate relationship between Mobil, Samarco, and Atlas ... the defendants cannot in reason and in law be held liable for accurately reporting the direct link that undisputably did exist between Mobil and Atlas." *Id.*

We think the logic of *Tavoulareas* is controlling here. Newspaper reporters should not be required to convert the results of investigative journalism into a Standard & Poor's report on the formalities of corporate structure. The sting of the charge that Liberty Lobby has approved of and assisted in the dissemination of Mr. Pearson's controversial views and the *Western Destiny* magazine, is substantially true. *See Restatement (Second) of Torts* § 581A, comment f (1977) ("It is not necessary to establish the literal truth of the precise statement made. Slight inaccu-

racies of expression are immaterial provided that the defamatory charge is true in substance."). Moreover, there is evidence in this record that Mr. Carto specifically designed the Liberty Lobby/Legion/Noontide/IHR network so as to divorce Liberty Lobby's name from those of its less reputable affiliates. *See infra* p. 1296. It is Mr. Carto's right to pour his political activities into whatever corporate shell he desires. What he may not do is silence those who see through the form to the reality.

**2.**

Even if a reasonable jury could find that Jaroslovsky and his editors falsely exaggerated Liberty Lobby's role in the dissemination of the Pearson books and *Western Destiny,* no jury could find that they did so with knowledge of falsity or reckless disregard for truth. After over a year of discovery, Liberty Lobby has not been able to adduce a scintilla of evidence indicating that anyone involved in the preparation of the Pearson article entertained any doubt about its veracity.

To the contrary, appellees' evidence reveals that Jaroslovsky thoroughly documented his story and relied upon wholly reputable sources in drawing the connection between Liberty Lobby and Noontide's publishing activities. Among Jaroslovsky's sources was a June 1980 issue of the *Facts* newsletter published by the Anti-Defamation League of B'nai B'rith ("ADL"). *See* Deposition of Richard Jaroslovsky, E.N. 32 & 33, exh. 45 (filed Aug. 6, 1985) [hereinafter "Jaroslovsky Dep."]; The Anti-Defamation League of B'nai B'rith, "The Spotlight: Liberty Lobby's Voice of Hate," *Facts,* vol. 26, No. 1 (June, 1980). Under the subtitle "Front for Anti-Semitism," the article states:

> For almost a quarter century, Liberty Lobby has served as a front for Carto's seamier operations and activities. Among these have been ... *Western Destiny,* a magazine that published racist, Nazi-tinged articles extolling the Nordic mystique; and Noontide Press, publisher of anti-Semitic, racist, and pro-Nazi books ....

*Id.* at 1. Later, the article refers to Noontide as "a Carto-influenced front." *Id.* at 4. Other ADL publications which Jaroslovsky reviewed in preparing the Pearson story referred to the "Carto Network" and described Noontide and *Western Destiny* as "Carto-run" and "official partners" in the Liberty Lobby conglomerate. *See* Jaroslovsky Dep., exh. 57; The Anti-Defamation League of B'nai B'rith, *Extremism on the Right—A Handbook* 25 (1983).

Jaroslovsky also relied upon an article by C.H. Simonds, entitled "The Strange Story of Willis Carto," which appeared in the September 10, 1971 issue of *The National Review.* Jaroslovsky Dep., exh. 60; Simonds, "The Strange Story of Willis Carto," *The National Review,* Sept. 10, 1971, at 983. The article flatly states that "[t]he sole owner and proprietor of Noontide is Willis Carto." *Id.* at 981. The article chronicles Mr. Carto's attempts to distance himself and Liberty Lobby from The Legion/Noontide network but concludes that "[t]he most casual observer soon detects a tight relationship among the various components of Carto's empire. The same names keep popping up on this letterhead, that masthead or board; it's a closed group, and only very rarely will the name of an outsider appear." *Id.* at 985.

During the composition of the story Jaroslovsky also possessed a copy of the masthead of *Western Destiny,* listing "E.L. Anderson," a known Carto pseudonym, as the sole associate editor. *See* Jaroslovsky Dep., exhs. 48 & 49. He also had obtained an advertisement published in *Western Destiny,* listing two Pearson books as available from Noontide Press. Jaroslovsky Dep., exh. 56. Finally, Jaroslovsky had a clipping from the Nazi publication, *White Power,* which advertised two of the Pearson works published by Noontide. *See* Jaroslovsky Dep., exh. 54.

We think *The Wall Street Journal*'s good faith reliance on previously published reports in reputable sources of Liberty Lobby's connections with Noontide and *Western Destiny* precludes a finding of actual malice as a matter of law. *See Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 862 (5th Cir.1978) ("The subjective awareness of probable falsity required by [*St. Amant*] cannot be found where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied.").

**B.**

We turn next to the charge of anti-Semitism, leveled against Liberty Lobby in the Jaroslovsky article and reported as the subject of a lawsuit in the Garment column. The district court suggested that the term "anti-Semitic" as used by Jaroslovsky is probably a constitutionally protected statement of opinion. The court went on to say that if "anti-Semitism" were regarded as an "objectively verifiable fact," it was amply proved against Liberty Lobby in this case. We are unwilling to say that the term has no core meaning so that it is an expression of opinion in any context, and, as such, always constitutionally protected. Like many words, the term "anti-Semitic" has both descriptive and normative content. Compare, for example, the use of "fascist" as a generic epithet, *see Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 786, 50 L.Ed.2d 777 (1977), with its use in such a statement as "He was a close companion of Mussolini and a Fascist." We tend to agree with the district court that if the term "anti-Semitic" has a core, factual meaning, then the truth of the description was proved here.[7]

**7.** Since its inception, Liberty Lobby has been an outspoken, often vicious, critic of Jewish groups and leaders, and of the United States' domestic and foreign policy in regard to Jewish issues. In a letter to subscribers to *The Spotlight,* Liberty Lobby characterized "political Zionism" as "the most ruthless, wealthy powerful and evil political force in the history of the Western world." Carto Dep., exh. 4; Letter from Willis

A. Carto to subscribers of *The Spotlight* at 5 (Jan. 2, 1985). *The Spotlight* has given extensive publicity to the fantastic claim that the Holocaust, the extermination of 6,000,000 Jews by Nazi Germany, never occurred. *See* LoBue Aff. ¶¶ 124, 154, 162, 190. A sampling of articles from *The Spotlight,* reveals titles such as: "Senator Commits Political Suicide by Assailing Power of Israeli Lobby"; "Jews' Favorite Candi-

■ We rest our decision, however, on the fact that Liberty Lobby has adduced no evidence tending to show the charge of anti-Semitism was made with the requisite actual malice. In preparing his story, Jaroslovsky relied upon various ADL publications, the Simonds article in *The National Review*, as well as the statements of the former general counsel of Liberty Lobby which were published in *The Washington Star. See* Jaroslovsky Dep., exh. 45 (ADL publication in the *Facts* series referring to Carto as "a long-time anti-Semite" and Liberty Lobby as "a front for anti-Semitism."); *id.,* exh. 64 (*Washington Star* report of statement of Mr. Warren Richardson, ex-General Counsel of Liberty Lobby, "condemn[ing] unequivocally the anti-Jewish, racist actions of the Liberty Lobby and some of their officers and employees.").

*The Journal*'s reliance on these and other reputable sources would preclude any finding of actual malice as a matter of law. *See supra* p. 1297. In *Liberty Lobby v. Anderson*, 746 F.2d 1563 (D.C.Cir.1984), *rev'd on other grounds* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), Liberty Lobby and Mr. Carto sued the journalist Jack Anderson and others for referring to Mr. Carto as "the leading anti-Semite in the country" and characterizing Liberty Lobby as "anti-Semitic." *Id.* In preparing their story, Mr. Anderson's reporters had relied upon various published accounts of Liberty Lobby's activities, including the ADL publications and *The National Review* article relied upon by Jaroslovsky here. Even applying the less stringent preponderance of the evidence test, this court held that reliance on these sources precluded a jury from finding actual malice. *Id.* Liberty Lobby was well aware of its status as a public figure from the outset of this litigation. Moreover, this court's decision in the *Anderson* case was issued two weeks before Liberty Lobby filed its complaint in this action. Yet, after a year of discovery Liberty Lobby has produced *no evidence* to

indicate that Jaroslovsky or his editors had any reason to doubt the same sources relied upon in *Anderson.* The district court's entry of summary judgment for appellees was clearly warranted on this ground alone.

### C.

■ Count three of Liberty Lobby's amended complaint seeks to attach liability to the Garment column's repetition of the charge of anti-Semitism and the publishing statements in referring to this lawsuit. Our prior determination that the publishing statements are substantially true would seem to preclude liability for their repetition. It is conceivable that liability could attach to the Garment column's repetition of the charge of anti-Semitism if it could be shown that the statement was false and was repeated with knowledge of falsity or reckless disregard of truth. However, we think the Garment column's discussion of a pending lawsuit is privileged as a fair and accurate description of a judicial proceeding under both the common law of the District of Columbia and the Constitution.

The Garment column states, "[s]till pending is a Liberty Lobby suit against *The Wall Street Journal*, which last year called Liberty Lobby 'anti-Semitic' and reported that it had published various tracts by a promoter of racial betterment through genetic selection." App. B, *infra,* p. 1305. The common law of libel has long held that one who republishes a defamatory statement "adopts" it as his own, and is liable in equal measure to the original defamer. *See Dameron v. Washington Magazine, Inc.,* 779 F.2d 736, 739 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *see also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* 799 (5th ed. 1984) ("Every repetition of the defamation is a publication in itself, even though the repeater states the source ... or makes

---

date Slipping"; "Israel Dictates U.S. Policy"; "ADL Plans Massive Brainwashing"; "Was There Really a 'Holocaust'?" and "Free Hess Sentiment Growing." *See id.* ¶¶ 151–224. In all its public pronouncements, Liberty Lobby has

consistently maintained the position that American Jewry exerts a disproportionate influence over all American institutions to the detriment of what Liberty Lobby believes are America's true interests. *See id.* ¶¶ 156–60.

clear that he himself does not believe the imputation.") (footnotes omitted).

To ameliorate the chilling effect that the republication rule would have on the reporting of controversial matters of public interest, common law courts, including those of the District of Columbia, recognize a privilege for fair and accurate accounts of governmental proceedings. *See Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88–90 (D.C.1980), *cert. denied*, 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981). Following the *Restatement*, the District of Columbia common law abandons the concept of "adoption" where a report of an official proceeding is "(a) accurate and complete, or a fair abridgment of what has occurred, and (b) published for the purpose of informing the public as to a matter of public concern." *Phillips*, 424 A.2d at 88 (quoting *Restatement (Second) of Torts* § 611 (1977)).

Federal constitutional concerns are implicated as well when common law liability is asserted against a defendant for an accurate account of judicial proceedings. In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the father of a deceased rape victim brought suit for common law invasion of privacy against a television station which mentioned his minor daughter's name in conjunction with its report on the trial of those charged with the crime. The station's reporter had obtained the victim's name by attending the trial and inspecting the indictments in the case. *Id.* at 470, 95 S.Ct. at 1033. The Georgia Supreme Court rejected the television station's first amendment defense, holding that the father was entitled to take his claim to a jury.

The Supreme Court reversed, noting that, "[w]ith respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox*, 420 U.S. at 492, 95 S.Ct. at 1044. *See also Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947) ("A trial is a public event. What transpires in a courtroom is public

property.... Those who see and hear what transpired can report it with impunity."). The Supreme Court held that Mr. Cohn's suit was barred as a matter of law, stating, "the First and Fourteenth Amendments command nothing less than that the states may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Cox*, 420 U.S. at 495, 95 S.Ct. at 1046. *See also Time, Inc. v. Firestone*, 424 U.S. 448, 457, 96 S.Ct. 958, 966, 47 L.Ed.2d 154 (1976) ("The public interest in accurate reports of judicial proceedings is substantially protected by *Cox*....").

The Garment column's report on this lawsuit is privileged both under the common law and the Supreme Court's decision in *Cox*. It fairly and accurately describes the substance of this action, in the context of a broader discussion of libel suits in general, clearly a matter of public concern. *See Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 839, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1 (1978) ("The operations of the courts and the judicial conduct of judges are matters of utmost public concern."). Indeed, since libel suits are government proceedings which by definition involve material that is allegedly false and defamatory, no meaningful discussion of such suits would be possible unless such reports were privileged. The district court's dismissal of this count on the pleadings was clearly appropriate.

### D.

■ The Garment column's discussion of *The National Review* trial is similarly protected. To the extent that it constitutes a factual report on Liberty Lobby's opening argument in *The National Review* trial, the Garment column is privileged as an accurate report of a government proceeding. *See supra* pp. 1298–99. It is undisputed that Ms. Garment attended the opening day of the trial and used the official transcript of that proceeding in the preparation of her column. Where the column quotes or summarizes Mr. Lane's opening argument, comparison with the official transcript reveals that it does so with

complete accuracy. Mr. Lane did indeed "explain[ ] how *The National Review* had tried to bring down great black men" and he did compare the writings of Mr. Buckley to the words of Adolf Hitler. *See* LoBue Aff., exh. 71 (Transcript of Proceedings in *Liberty Lobby v. National Review, Inc.*, No. 79–3445, at 150–82).[8]

■■■ No extended analysis is necessary to conclude that the remainder of the Garment column is constitutionally protected opinion under *Ollman.* The column appeared on the editorial page of *The Journal,* and is shot through with the language of personal opinion. The column characterizes Mr. Lane's argument as "crude," "ugly," "pernicious" and "breathtaking in its daring." These are clearly statements of opinion dependent upon personal perspective: what is a crude and ugly appeal to some, may be forthright and vigorous advocacy to others. *See Greenbelt Coop. Publishing Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1541–42, 26 L.Ed.2d 6 (1970) (characterization of real estate developer's vigorous negotiation strategy at town meeting as "blackmail" held constitutionally protected opinion).

Statements of this type are simply not amenable to disproof. Whether or not Mr. Lane in front of a jury "generates a distinct shiver" is a subjective impression, and as such inherently unverifiable. *See* Franklin & Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity,* 25 Wm. & Mary L.Rev. 825, 869 (1984) ("[E]valuative statements of taste and belief can never provide the basis for a defamation suit because such statements are incapable of being proved false.").

On appeal, Liberty Lobby contends that several alleged factual errors in the Garment column strip it of the constitutional protection otherwise accorded to statements of opinion. *See* Brief of Liberty Lobby at 29–33. Appellant argues that the "black lawyer" placed at its counsel table

by the Garment column, although a law school graduate, was not a member of the bar. *Id.* at 33. It further contends that *The National Review* exercised its preemptory challenges to assure an all black jury at trial because it intended to put on favorable testimony from black witnesses. *Id.* Thus, the Garment column's "implication" that Liberty Lobby chose a black lawyer and a black jury to further its trial strategy is, in Liberty Lobby's view, false. Relying on the concurring opinion of one judge in the original panel disposition of the *Ollman* case, *see Ollman v. Evans,* 713 F.2d 838, 848–49 (D.C.Cir.) (Robinson, C.J., concurring), *vacated and reh'g en banc granted,* 713 F.2d 838 (1983), Liberty Lobby argues that the Garment column's failure to fully and accurately disclose the underlying facts of *The National Review* trial precludes it from claiming the status of protected opinion. *See* Brief of Liberty Lobby at 28.

As both a legal and factual matter, Liberty Lobby's argument is utterly devoid of merit. First, the opinion upon which Liberty Lobby relies was vacated and became a dissenting position held by only one judge in the final disposition of the *Ollman* case. *See Ollman,* 750 F.2d at 1016 (Robinson, C.J., dissenting). Appellant's characterization of this position as the holding of this court is preposterous. The majority of the court read *Gertz* "to provide absolute immunity from defamation actions for all opinions." *Ollman,* 750 F.2d at 974. While the stated facts underlying an opinion may support a libel action if they are themselves false and defamatory, an opinion itself never can.

Second, the alleged inaccuracies here are either minor in the extreme or nonexistent. That the black woman at Liberty Lobby's counsel table was a law school graduate but not a member of the bar is immaterial. Referring to her as a lawyer is not of itself

---

8. On a motion for judgment on the pleadings, the district court was entitled to take judicial notice of the record in *The National Review* case to determine that the Garment column's summary of those proceedings was fair and accurate. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 157, 89 S.Ct. 935, 942, 22 L.Ed.2d 162 (1969); *Dixon v. Jacobs,* 427 F.2d 589, 596 (D.C.Cir.1970) ("It is clear to us that the district court was entitled to take judicial notice of its own records.").

defamatory, and is, in any event, substantially true. Moreover, the Garment column does not state that Liberty Lobby selected an all black jury. The article stated that an all black jury "is not uncommon in the District"; it did not implicitly or explicitly attribute the composition of the jury to either party. The district court was clearly correct in holding that the bulk of the Garment column is constitutionally protected under *Ollman*. Since opinions are non-actionable as a matter of law, dismissal on the pleadings of counts three, four, and five of Liberty Lobby's amended complaint was appropriate.

### III.

■■ On appeal, Liberty Lobby raises several issues collateral to the merits of its libel action. First, appellant asserts that the district court judge erred in failing to recuse himself after counsel for Liberty Lobby made two oral motions for his disqualification. *See* Brief of Liberty Lobby at 9–12. These motions were based upon the district court's decision not to allow Liberty Lobby to further depose Ms. Garment. *Id.* at 9–10. Second, Liberty Lobby asks us to pass on a third written motion for the recusal of the district court judge. *Id.* at 10. This motion was filed after the district court granted appellees' dispositive motion, and has not been passed upon by the district court judge. Finally, Liberty Lobby claims that the district court's discovery rulings precluded it from developing evidence of actual malice on the part of Ms. Garment, and prevented it from discovering who actually authored the Garment column's reference to the Jaroslovsky article. *Id.* at 12–18. These claims need detain us only briefly.

The only ruling of the district court on the question of disqualification was in response to an oral motion by appellant's counsel apparently based on the district court judge's decision to deny appellants' second motion to compel further testimony from Ms. Garment. *See* Transcript of Proceedings taken on Feb. 27, 1986, E.N. 83 (filed Mar. 6, 1986). The motion was based entirely upon the trial judge's rulings from the bench on discovery issues. It is well settled that a motion for recusal under 28 U.S.C. § 144 or § 455 (1982), must be based upon prejudice from an extra-judicial source. *See United States v. Heldt*, 668 F.2d 1238, 1272 & n. 71 (D.C.Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). As we stated in *United States v. Haldeman*, 559 F.2d 31, 133 (D.C.Cir.1976) (en banc), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), "[t]he attitude for which section 144 mandates recusal is not indicated by prior judicial rulings, or in-court comments prompted by developments in the case or prior legal proceedings, or the exercise of related judicial functions." (footnote omitted). Since Liberty Lobby's two in-court motions were based entirely upon the district court's discovery rulings in this case, their denial was clearly proper.

Appellant's written motion for recusal was filed over two months after the district court issued its ruling on the merits and some six weeks after appellant filed its notice of appeal in this court. *See* Plaintiff's Motion for Disqualification, E.N. 110 (filed Sept. 25, 1986). The district court presently has before it this recusal motion and a motion for sanctions filed by appellees. *See* Motion of Defendants for Sanctions, E.N. 96 (filed July 28, 1986). Pursuant to Liberty Lobby's request, the district court has stayed all action on defendants' request for sanctions pending disposition of this appeal. *See* Order Staying Proceedings, E.N. 111 (filed Sept. 24, 1986).

■■ Under these circumstances, we do not think that appellant's written motion for recusal of the district court judge is properly before us at this time. Recusal is a highly personal decision. The judge must assess the truth of the facts alleged and determine if they would impeach his impartiality or appearance of impartiality. *See Heldt*, 668 F.2d at 1271–72. This is not a decision that an appellate panel may make for a district court judge in the first instance. A motion for recusal based upon the appearance of impropriety can have only prospective effect. *See United States v. Murphy*, 768 F.2d 1518, 1539 (7th Cir.

1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986). Orders entered prior to the recusal motion are unaffected by its disposition, absent a showing of actual bias. *See Murphy,* 768 F.2d at 1539 ("Our research has not turned up any case involving mere appearance of impropriety in which the court has set aside decisions that had been taken by the district judge before any party asked for recusal."). *Accord Mims v. Shapp,* 541 F.2d 415, 417 (3d Cir.1976). Thus, appellant's motion can in no way affect the district court's judgment in this action or our holding on appeal. It is for the district court judge to decide as an initial matter whether he will rule on appellee's motion for sanctions or step aside in favor of another judge.

 Liberty Lobby also argues that the district court erred in refusing to compel further deposition testimony by Ms. Garment. Specifically, appellant alleges that it was improperly denied additional discovery which would have uncovered evidence of Ms. Garment's actual malice in publishing her account of *The National Review* trial. The short answer to this contention is that evidence of actual malice is irrelevant to the issues upon which the district court granted appellees' motion for judgment on the pleadings. The district court held that the defamatory portions of the Garment column were constitutionally protected opinion. *See Liberty Lobby, Inc. v. Dow Jones & Co.,* 638 F.Supp. 1149, 1154 (D.D. C.1986). We have affirmed that ruling on appeal. *See supra* pp. 1300–01. Opinions are nonactionable as a matter of law. *See supra* p. 1300. Indeed, the concepts of knowledge of falsity or reckless disregard of truth cannot even sensibly be applied to an expression of personal belief.

Moreover, the record reveals that the appellant deposed Ms. Garment for some fifteen hours over the course of three days. *See* Deposition of Suzanne R. Garment, E.N. 87, 88 & 89 (filed Mar. 12, 1986) [hereinafter "Garment Dep."]. Much of the questioning wandered extremely far afield. Ms. Garment was asked about her views on the "suffering of the Palestinian people," the massacres at Sabra and Shatila, and a host of other political subjects not shown to be even tangentially relevant to this action. *See* Garment Dep. at 553–649. Under these circumstances, the district court clearly did not abuse its discretion in cutting off further discovery.

Appellant also contends that the district court's discovery rulings prevented it from establishing who exactly was the author of the Garment column's reference to this action. *See* Brief of Liberty Lobby at 21–26. Because the identity of the author was thus "concealed" from it, appellant was denied the opportunity to establish actual malice on the author's part. *Id.* at 21.

This contention is wholly devoid of merit. First, we have held that the Garment column's reference to this action is absolutely privileged as an accurate report of a judicial proceeding. The mental state of its author is irrelevant to this issue. Second, the record reveals that this portion of the Garment column was revised by Mr. Melloan, an editor at *The Journal,* in consultation with libel counsel. *See* Garment Dep. at 357–60. The trial court's refusal to allow further inquiry in this area had nothing to do with authorship. Rather the court held that discussions between Mr. Melloan and Dow Jones' counsel were protected by the attorney-client privilege. *See* Transcript of Proceedings taken on Feb. 27, 1986, E.N. 83, at 8–10 (filed Mar. 6, 1986).

In *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Supreme Court held that communications between corporate counsel and a corporation's employees made for the purpose of rendering legal advice are protected by the attorney-client privilege. Such discussions are shielded from discovery in order to assure "full and frank legal advice to the employees who will put into effect the client corporation's policy." *Id.* at 392, 101 S.Ct. at 684. Pre-publication discussions between libel counsel and editors or reporters would seem to come squarely within the scope of the privilege as defined in *Upjohn. See Dowd v. Calabrese,* 589 F.Supp. 1206, 1215 n. 37 (D.D.C.1984) (discussions between editor and libel counsel

protected by attorney-client privilege); *Davis v. Costa–Gavras,* 580 F.Supp. 1082, 1098–99 (S.D.N.Y.1984) (discussion with attorney at pre-release libel review of film held protected by attorney-client privilege). The basis for the privilege was adequately established in the record and the appellant has made no showing that facts known to Dow Jones' libel counsel could not be ascertained from other witnesses. Under these circumstances, the district court's ruling will be affirmed.

## IV.

This suit epitomizes one of the most troubling aspects of modern libel litigation: the use of the libel complaint as a weapon to harass.[9] Despite the patent insufficiency of a number of appellant's claims, it has managed to embroil a media defendant in over three years of costly and contentious litigation. The message to this defendant and the press at large is clear: discussion of Liberty Lobby is expensive. However well-documented a story, however unimpeachable a reporter's source, he or she will have to think twice about publishing where litigation, even to a successful motion for summary judgment, can be very expensive if not crippling.

We have conducted an independent review of the record in this case, and have found that each of appellant's claims is clearly barred on several common law and constitutional grounds. The district court's judgment dismissing all of Liberty Lobby's claims with prejudice is

*Affirmed.*

**9.** Liberty Lobby has brought a number of libel suits against media defendants that have characterized it as racially prejudiced or anti-Semitic. *See, e.g., Dall v. Pearson,* 246 F.Supp. 812 (D.D.C.1963), *aff'd,* C.A. No. 18, 414 (D.C.Cir. Oct. 22, 1964), *cert. denied,* 380 U.S. 965, 85 S.Ct. 1108, 14 L.Ed.2d 155 (1965) (libel suit based on columnist's statements that Liberty Lobby's congressional testimony was an "anti-Semitic diatribe" and "an attack on the Jews"); *Liberty Lobby, Inc. v. Anderson,* 562 F.Supp. 201 (D.D.C.1983), *aff'd in part, rev'd in part,* 746 F.2d 1563 (D.C.Cir.1984), *rev'd in part,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (libel suit based upon magazine's statements that Liberty

## APPENDIX A

*Controversial Publisher*

## RACIAL PURIST USES REAGAN PLUG

By Rich Jaroslovsky

*Staff Reporter of* The Wall Street Journal

WASHINGTON—Roger Pearson, a publisher of politically conservative academic journals here, has something other publishers would envy: a glowing letter of praise from Ronald Reagan.

Plenty of well-known conservatives have written for Mr. Pearson's publications, but his kudos from the most famous conservative of all stands out. Mr. Pearson has used reproductions of the 1982 Reagan letter—praising "your substantial contributions to promoting and upholding those ideals and principles we value at home and abroad"—in bulk mailings to solicit sales and subscriptions.

Those who have received copies of the presidential letter might be surprised to learn that Mr. Pearson, a British-born anthropologist, has spent much of his career advancing the theory that the "purity" of the white race is endangered by "inferior" genetic stock. He has warned that people of European descent may be "annihilated as a species" unless they act to preserve their "racial identity," and he currently receives funds from a controversial foundation dedicated to "racial betterment."

The 57–year-old Mr. Pearson even draws harsh attacks from other elements of the

Lobby was "anti-Semitic" and "infiltrated by Nazis"); *Liberty Lobby, Inc. v. National Review, Inc.,* No. 79–3445, (D.D.C. Apr. 20, 1982) (libel action based on *The National Review's* characterization of Liberty Lobby as "a hotbed of anti-Semitism"); *Liberty Lobby, Inc. v. Rees,* 667 F.Supp. 1 (D.D.C.1986) (libel action based on characterization of Liberty Lobby as racist and anti-Semitic); *Carto v. Buckley,* 649 F.Supp. 502 (S.D.N.Y.1986) (libel action based on charge that the "distinctive feature" of Liberty Lobby publication, *The Spotlight,* is "racial and religious bigotry"). None of these suits has been successful and in *no instance* has Liberty Lobby been allowed to present its claims to a jury.

hard right, members of which fear he may discredit their goals. He resigned from the World Anti–Communist League, a federation he once headed, after some of its chapters charged that he encouraged the membership of European and Latin American groups with Nazi or neo-Nazi ties. Former Maj. Gen. John Singlaub, who now heads the league's U.S. affiliate, calls Mr. Pearson an "embarrassment" who is "not at all welcome in any activity" of the group.

"The White House ought to repudiate this bird," says Justin Finger, civil-rights director of the Anti–Defamation League of B'nai B'rith, the Jewish organization. Mr. Finger complained to the White House when he learned of the letter this summer, but he says he hasn't received any response.

Composed by Pearson Associate

Though the letter bore Mr. Reagan's signature, it was actually composed by a Pearson associate who had joined the White House staff. There isn't any evidence that the president knows Mr. Pearson, and Mr. Reagan's public statements on race don't bear any resemblance to Mr. Pearson's writings. But the incident shows how a highly ideological presidency—conservative or liberal—can be used by well-connected outside activities to gain respectability.

What's more, the White House isn't disavowing the letter, or repudiating Mr. Pearson, though it wants him to stop using the letter to sell subscriptions to two journals he currently publishes, The Mankind Quarterly and The Journal of Social, Political and Economic Studies. Anson Franklin, an assistant presidential press secretary, says: "The president has long-held views opposing racial discrimination in any form, and he would never condone anything to the contrary. But that's a general statement; I'm not addressing Dr. Pearson specifically."

The White House says the letter was written after Mr. Pearson sent to the president a copy of one of his journals that didn't espouse his controversial racial views. Not all such gifts are answered so glowingly, but in this case Mr. Pearson had a champion in Robert Schuettinger, then a mid-level White House official and currently in the Defense Department.

Mr. Schuettinger says he has known Mr. Pearson for several years and is on the editorial board of one of Mr. Pearson's publications. He concedes he wasn't aware of all of Mr. Pearson's past activities but says "there was absolutely no valid grounds to accuse him of racism," though Mr. Pearson may have been "a little naive" in his associations.

In two lengthy interviews, the affable Mr. Pearson largely refuses to comment on the record about his activities, though he doesn't dispute the central elements of this account of them. But he insists, "I'm not ashamed of anything I've said or written."

'Breeding Ideal Types'

Among those writings is an old article calling for the use of artificial insemination to preserve "pure healthy stock" and allow "breeding back the 'ideal' types." The 1958 article, in a magazine Mr. Pearson founded called Northern World, also warned of a "terrible outcome" should such a program of genetic selection "fall into the hands of the cosmopolites or one-worlders, or any who wish to see our race and our heritage destroyed."

Other Pearson writings appeared in Western Destiny, a magazine published by the far right, anti-Semitic Liberty Lobby. Mr. Pearson edited Western Destiny briefly in the mid–1960s and wrote several books on race and eugenics that were issued by Liberty Lobby's publishing arm. These pamphlets are still sold by the National Socialist White People's Party, the Arlington, Va.-based American Nazi group; Mr. Pearson says he doesn't have any connection with that group.

After breaking with Liberty Lobby Leader Willis Carto in a personal dispute, Mr. Pearson began moving more into the conservative mainstream, holding academic posts at several small colleges and autho-

rizing [sic] an anthropology textbook. In 1977, he was on the original board of editors of Policy Review, a journal published by the Heritage Foundation, a mainstream conservative think tank. Knowledgeable sources say he was asked to resign when Heritage officials learned of his background.

Mr. Pearson currently runs a tax-exempt organization called the Council on Social and Economic Studies out of a three-room suite in a downtown Washington apartment building. Besides his publishing income, he acknowledges that he also receives money from the Pioneer Fund, a controversial New York-based trust fund dedicated to "racial betterment." The fund also has supported the work of psychologist Arthur Jensen and physicist William Shockley, who hold views on race and heredity similar to Mr. Pearson's.

Mr. Pearson's current publications, which generally play down his racial views, boast contributions from some eminently respectable conservative political figures. Spokesmen for several of Mr. Pearson's contributors say they weren't aware of his background when they submitted articles.

"Generally, conservatives are so concerned with conspiracies on the left that they don't realize when they may be part of a conspiracy on the right," asserts John Rees, a contributing editor of the John Birch Society's magazine and a harsh critic of Mr. Pearson.

## APPENDIX B

## THERE'S NOTHING LIKE A LIBEL TRIAL FOR AN EDUCATION

———

Capital Chronicle

By Suzanne Garment

———

Behind a lectern in a Washington, D.C., courtroom this week stood Mark Lane, lawyer to controversial causes of right and left, making his opening statement. He paused for emphasis before hitting the jury with his central thesis: "National Review, since its inception, has been a racist, pro-Nazi, pro-fascist publication."

National Review is the conservative magazine edited by William F. Buckley Jr. Was Mr. Lane making his charge on behalf of some aggrieved liberal—a maligned arms-control enthusiast, perhaps, or some annoyed chapter of the American Civil Liberties Union? No, Mr. Lane's client is the Liberty Lobby, whose leader Willis Carto once promoted a Joint Council for Repatriation to help blacks to go back to Africa. The resulting legal contest is bizarre, but also instructive.

Over the years, Liberty Lobby and Mr. Carto have sued a number of publishers that called them racist and anti-Semitic. Still pending is a Liberty Lobby suit against The Wall Street Journal, which last year called Liberty Lobby "anti-Semitic" and reported that it had published various tracts by a promoter of racial betterment through genetic selection. Liberty Lobby brought one of these suits against National Review and lost. Now a judge and jury are hearing the trial of the counterclaim.

The look of the courtroom on the trial's opening day gave notice that this was not an ordinary proceeding. True, over at National Review's table there sat a conventional bunch, Mr. Buckley and his lawyers. Across the room with Mr. Carto were the bearded Mr. Lane in friendly navy blazer and gray slacks, a young female paralegal with the kind of nose that suggests the presence of a trust fund, and a young, good-looking black female lawyer in a high-collared blouse. The moment the jury filed in—all black, as is not uncommon in the District—you began to suspect that Mr. Lane might have something in mind.

He opened with a well-known quote from Iago in Shakespeare's "Othello": "He who filches from me my good name robs me of that which enriches not him but makes me poor indeed."

Then Mr. Lane picked up speed. "Iago was an interesting character," he instructed his jury. "What he did was to bring down a great black man named Othello because he was black." "The analogy," he said, "continues in this case."

Mr. Lane explained how National Review had tried to bring down great black men. He gave a critique of the magazine's position on Adam Clayton Powell Jr. He condemned its attitude toward Martin Luther King Jr. He built to a peroration: "If you read the words of Adolf Hitler regarding superior races and advanced races and inferior races, you will have difficulty separating the words of Mr. Buckley in his editorials in the National Review from the words of Adolf Hitler."

Mr. Lane's theme was ironic in more than the obvious ways. Today's American conservatism does indeed have part of its roots in a seedbed infested with racism, chauvinism and paranoid looniness. When National Review was found in the mid–1950s, the right's presence on the U.S. political stage was small and fading; conservatism seemed fatally tied to this pernicious kookiness.

From time to time in National Review you can still hear an echo of the right's more distasteful origins. The sound fades as time passes because over the years Mr. Buckley and his associates, with National Review as a rallying place, pried conservatism loose from the fingers of its more demented followers.

Some people would claim that these "respectable conservatives" have only managed to put an acceptable mask over what remains an illegitimate set of views. Willis Carto, for his part, clearly thinks the National Review bunch profoundly changed the character of the American right. That is presumably why he is at permanent war with it.

So we see the Liberty Lobby standing up in court and calling Mr. Buckley racist, most likely calculating that black jurors will be too hypnotized by this possibility to consider other facts important. This is not just an ordinary lawyer's trick. This is breathtaking in its daring. Most of us would be embarrassed to appeal to a racial or religious minority audience so crudely. We know the Fair Play Patrol would at once swoop down and cart us away. But the Carto team is of sterner stuff, able to put its head down and go for broke.

It gets you thinking about libel suits in general and their place in democratic politics. They are in vogue now, especially as a way to fight the press. Without a doubt current journalistic habits deserve some fighting against. Still, these suits attacking pernicious speech generate their own share of pernicious speech. Trials held to fight destructive ugliness in American public life provide their own arena in which the parties can make ugly appeals. Highly public events like a blazing newspaper headline, or Louis Farrakhan wowing them at Madison Square Garden, can be a grim sight. But believe me, Mark Lane in front of the jury also generates a distinct shiver.

Democracies keep searching for the rules and procedures that will keep their violent and excessively partisan tendencies surely in check. There aren't any. Each new device will prove vulnerable to abuse in its turn. The only real defense lies in imprecise areas like education and culture, where matters are never settled and battles never won.

When you catch a glimpse of the muck lying in pockets just under our political surface, you are reminded of how lucky we've been. Next time I walk through those courtroom doors I will knock wood.