**John M. COLES, Plaintiff,**

v.

**WASHINGTON FREE WEEKLY, INC., et al., Defendants.**

Civ. A. No. 94–825.

United States District Court, District of Columbia.

March 27, 1995.

Kenneth Hyden Shepherd, Washington, DC, for plaintiff.

Henry S. Hoberman, Robert D. Lystad, Baker & Hostetler, Washington, DC, for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on Defendant Washington Free Weekly, Inc.'s and Defendant William Gifford's motion for summary judgment. Plaintiff John Coles filed this action for defamation after the Washington City Paper ("City Paper") published a feature article in April 1993 written by reporter William Gifford about the efforts by a group of former Diamond cabdrivers to regain control of Diamond Cab Company. Plaintiff, a lawyer, represented the cabdrivers before the District of Columbia Taxi Commission. Plaintiff claims that the article contains implicit and express defamation, portraying him as an incompetent, overpaid lawyer who required substantial assistance from his client and who was not familiar with appropriate dress standards for court.

## FACTUAL BACKGROUND

Several Diamond cabdrivers lead by Ata Farahpour started an inquiry when Diamond Cab Company began changing the way that it did business. The Company, which had been a non-profit corporation for 61 years, had been taken over by less than 20 shareholders, who were previously board members of the nonprofit corporation, and turned into a for-profit corporation. The new for-profit Company required the drivers to repaint their cabs at their own expense and stopped paying certain death benefits. Whatever membership rights the cabdrivers had previously been accorded were substantially reduced.

Diamond Cab Company fired several of the drivers for creating dissension and attempting to compete with the company. The drivers ignored this action and continued to operate their cabs. The owners then filed suit against the drivers for trademark infringement and unlawful competition. In response, the drivers filed their own complaint with the D.C. Taxi Commission for wrongful termination. In February 1992, after losing a battle in the trademark case, the drivers, including Ata Farahpour, hired Plaintiff Coles to represent them in two related unlawful competition actions before the Superior Court and in the drivers' claims for wrongful termination before the Taxi Commission. At the time he was hired, Coles was a full-time lawyer for the Federal Communications Commission and took on the representation as "outside" legal work.

Reporter William Gifford wrote a seven page, one hundred and six paragraph article, entitled "The Keys to Diamond Cab," detailing the history of the company and the battle between the drivers and the "new owners." Plaintiff objects to his portrayal in the eight paragraphs that are somehow related to his representation of the drivers, claiming that the article implies that he was "incompetent, unprofessional and ill-prepared." Plaintiff's Opposition at 3.

Plaintiff specifically charges that the following statements constitute actionable defamation:

1. "With four other drivers, he [Mr. Farahpour] formed the ITOA Legal Defense Fund, soliciting contributions from Diamond's ranks of nearly 400 drivers. The donations of $20, $50, $100, and more were recorded in a green ledger, and most of the money has gone to pay their lawyer, John Coles."

2. "At one end of the parties' table sat Waller's lawyers, Pierre LaForce and George Hughes, dressed in standard-issue dark lawyer suits. At the other

end, the drivers clustered around their attorney, John Coles, who also holds down a full-time job at the Federal Communications Commission.... 'Mr. Coles, this is a proper legal proceeding,' panel Chair John Jessamy admonished Coles as he prepared to give his opening statement. 'Would you please mind tying your tie and buttoning your shirt.' "

3. "Throughout the four-day hearing, both sides seemed to use confusion as a weapon. Coles repeatedly neglected to pursue key lines of questioning, while reiterating a vague claim that as a nonprofit, ITOA was somehow 'sacred.' "

4. "Throughout the hearing, Farahpour sat by Coles and occasionally interjected bits of his own commentary, unbidden by his lawyer or the panel. This is his case, after all. He did the legwork to gather evidence, he researched the law."

5. "Over the next few months, Farahpour made eight trips to Dover to search corporate records and studied every subparagraph of D.C. taxicab and corporate law."

Complaint, ¶ 5.

## SUMMARY JUDGMENT STANDARDS

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Mere allegations or denials of the adverse party's pleadings are not enough to prevent issuance of summary judgment. The adverse party's response to the summary judgment motion must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e).

The Supreme Court set forth the governing standards for issuance of summary judgment in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex*, the Supreme Court recognized the vital need for summary judgment motions to the fair and efficient functioning of the justice system:

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1....

Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555. (citation omitted).

The plaintiff, as the non-moving party, is "required to provide evidence that would permit a reasonable jury to find" in his favor. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987) (*per curiam*) (citing *Celotex, supra*). The moving party is entitled to summary judgment where "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex* at 323, 106 S.Ct. at 2552.

## ANALYSIS AND DECISION

The First Amendment is one of the great pillars of our democratic system of government established by our founding fathers. The freedom of the press protects the public's ability to inform itself about matters of public concern and engage in thoughtful debate. That being said, freedom of the press is not without certain limitations. Indeed, a large body of common and constitutional law has developed regarding these limitations, particularly in the field of defamation which is the subject of this lawsuit.[1]

---

1. A canon of constitutional litigation holds that    constitutional law issues should not be reached if

Given the threat to the first amendment· posed by nonmeritorious defamation actions, it is particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted. The D.C. Circuit has stated,

> In the First Amendment area, summary procedures are ... essential. For the stake here, if harassment succeeds, is free debate.... The threat of being put to the defense of a lawsuit ... may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself.

*Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).

To prevail in a defamation suit, Plaintiff must prove that the statements complained of are i) defamatory; ii) capable of being proven true or false; iii) "of and concerning" the Plaintiff; iv) false and v) made with the requisite degree of intent or fault. See *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1292–93 (D.C.Cir.1988), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *See New York Times Co. v. Sullivan,* 376 U.S. 254, 288, 84 S.Ct. 710, 730, 11 L.Ed.2d 686 (1964); *Fleming v. AT & T Information Servs., Inc.,* 878 F.2d 1472 (D.C.Cir.1989). If the Plaintiff fails to create a triable issue of material fact with respect to any element of the defamation cause of action for which the Plaintiff has the burden of proof, then summary judgment in favor of the defendant is appropriate.[2]

In the following pages, each statement claimed by Plaintiff to be actionable defamation will be analyzed to determine whether there has been a failure of proof based on the

common law and constitutional protections afforded to the press to publish articles on issues of public interest.

### Admonition About Coles' Attire By D.C. Taxi Commission Chairman

> "At one end of the parties' table sat Waller's lawyers, Pierre LaForce and George Hughes, dressed in standard-issue dark lawyer suits. At the other end, the drivers clustered around their attorney, John Coles, who also holds down a full-time job at the Federal Communications Commission.... 'Mr. Coles, this is a proper legal proceeding,' panel Chair John Jessamy admonished Coles as he prepared to give his opening statement. 'Would you please mind tying your tie and buttoning your shirt.'"

The common law recognizes the privilege of newspapers and reporters to publish fair and accurate reports of official proceedings, including proceedings which are judicial in character that "take place before administrative, executive or legislative bodies...." *Harper v. Walters,* 822 F.Supp. 817, 824 (D.D.C.1993), quoting *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 88(D.C.App.1980); see also *Liberty Lobby,* 838 F.2d at 1298–99. The hearing held before the Taxi Commission is exactly the type of official proceeding that is meant to be covered by the "fair report" privilege. The D.C. Circuit articulated the necessity of such a privilege to our form of government:

> [T]he intended beneficiary of the privilege is the public, not the press. The privilege is not simply some convenient means for shielding the media from tort liability. Rather, the privilege springs from the recognition that in a democratic society, the public has both the right and the need to

they can be avoided by deciding a case on common law or statutory grounds. *See, e.g., Syracuse Peace Council v. F.C.C.,* 867 F.2d 654, 657 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990) (citing *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). Defamation, however, is inextricably linked to first amendment issues and courts frequently address the constitutional implications of defamation actions.

2. The various elements of a defamation cause of action will be discussed in more detail in the Court's analysis of the various statements alleged by Plaintiff to be actionable defamation. In ruling on this summary judgment motion, the Court does not find it necessary to reach the requisite degree of fault element and the concomitant complexities of the public/private figure dichotomy.

know what is being done and said in government.

*Dameron v. Washington Magazine*, 779 F.2d 736, 739 (D.C.Cir.1985), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986).

As the name of the privilege makes clear, to take advantage of the privilege, the report must be both fair and accurate. Where the challenged passage is a verbatim account of statements made by the Taxi Commission Chairman at the hearing there can be no dispute as to the accuracy of the account.[3] While it might be possible to argue that a verbatim accounting was not fair because the quoted section was taken out of context, such was not the case here. The Court was admonishing the Plaintiff for his attire.[4]

To avoid summary judgment, Plaintiff must create a triable issue of fact as to whether the statement is false. Here, however, Plaintiff admits that the statement by the Chairman of the Taxi Commission regarding his attire was "substantially true." *See, e.g., Masson v. New Yorker Magazine*, 501 U.S. 496, 516–17, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991) ("Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'"). Plaintiff claims in his complaint, "In fact, plaintiff's tie was tied, but his top button on his shirt was open and his tie was not pulled all the way up." Complaint, ¶ 6(d).

Accordingly, the Court finds that the passage regarding the Chairman's admonition about Plaintiff's attire is protected speech both because it is substantially true and because it is privileged as a fair report.

### Statement that Plaintiff was a Full–Time Government Lawyer

"At one end of the parties' table sat Waller's lawyers, Pierre LaForce and George Hughes, dressed in standard-issue dark lawyer suits. At the other end, the drivers clustered around their attorney, John Coles, who also holds down a full-time job at the Federal Communications Commission....."

■ Plaintiff claims that the article creates the impression that Plaintiff "could not provide competent legal representation because he was a full-time government employee." Plaintiff's Opposition at 3–4. Plaintiff readily admits he was a full-time lawyer for the FCC. The fact that a reader may assume that a full-time FCC lawyer may not have as much time to devote to "outside" legal work does not make the statement actionable. That the truth carries a negative implication does not give the Plaintiff a meritorious defamation cause of action. It is an inescapable conclusion that this statement is nonactionable defamation because Plaintiff has admitted its truth.

### Statements that Plaintiff was "Vague", used "Confusion" as a weapon and did not ask "Key" questions

"Throughout the four-day hearing, both sides seemed to use confusion as a weapon. Coles repeatedly neglected to pursue key lines of questioning, while reiterating a vague claim that as a nonprofit, ITOA was somehow 'sacred.'"

■ The first point to highlight is that Defendant Gifford fairly and accurately reported that Plaintiff had described the nonprofit Diamond Cab Company ("ITOA") as "sacred." DCTC Trans., Feb. 26 at 69–70.

As for Reporter Gifford's subjective impressions of the Plaintiff's argument before the Taxi Commission, it is necessary to discuss the jurisprudence that has evolved regarding the "fact/opinion" distinction. In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court held that only statements that are objectively verifiable as false can be actionable. The Court found that there is not a "wholesale defamation exemption for anything that might be labelled as 'opinion,'" noting that "[s]imply couching" a statement

---

**3.** The accuracy requirement relates to the accuracy of the reporting, not the truth of the alleged defamatory statement itself.

**4.** The Ninth Circuit held that the question of whether a newspaper's account is a fair and accurate report is a question of law where there is no dispute as to what occurred at the judicial proceeding and what was contained in the newspaper account. *Dorsey v. National Enquirer, Inc.*, 973 F.2d 1431, 1435 (9th Cir.1992).

"in terms of opinion" by placing the words "in my opinion" before the statement should not serve to protect the statement. *Id.* at 18–19, 110 S.Ct. at 2705–06. But, a "statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at 20, 110 S.Ct. at 2706. Such a formulation "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation.'" *Id.*

In *Liberty Lobby,* the D.C. Circuit held that statements characterizing an attorney's courtroom argument as "crude," "ugly," "pernicious," and "breathtaking in its daring," were not actionable because "[e]valuative statements of taste and belief can never provide the basis for a defamation suit because such statements are incapable of being proved false.'" *Liberty Lobby,* 838 F.2d at 1300 (citation omitted).

Similarly, statements characterizing Plaintiff's arguments as "vague," "confusing" and incomplete are not capable of being proven true or false—these statements are "genuine opinion."[5] Reasonable people could differ as to quality and thoroughness of Plaintiff's arguments before the Taxi Commission.

Plaintiff suggests that Defendant Gifford as a non-lawyer did not understand the proceedings and had a duty to confer with an attorney familiar with this area of law who certainly would have opined that Plaintiff had addressed all appropriate issues before the Commission. The First Amendment, however, does not provide protection to reporters commenting on legal proceedings only if those reporters are lawyers or are in the company of a lawyer. We have not yet reached the stage where to survive in our society everyone must have an attendant lawyer for every phase of that person's professional and personal activities.

It must be the case that the First Amendment protects a reporter who is simply providing his analysis of the clarity and thoroughness of a lawyer's arguments at a public

hearing. Public debate would be stymied if a reporter could not provide commentary on an attorney's courtroom performance no matter how unpleasant the commentary in the view of the "performer." Critics must be able to express their views. This occurs all the time with respect to the arts. Many a career has been set back because of critics' harsh words.

Closely akin to the First Amendment protection for statements that cannot be objectively verified as true or false ("genuine opinion") is the common law fair comment privilege. The "fair comment" privilege "was incorporated into the common law as an affirmative defense to an action for defamation" out of "concern that unduly burdensome defamation law could stifle valuable public debate." *Milkovich,* 497 U.S. at 13, 110 S.Ct. at 2702. The privilege "afford[ed] legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact.'" *Id.* (citation omitted). In the District of Columbia, the fair comment privilege is applicable "even if the facts upon which it [the opinion] is based are not included along with the opinion." *Fisher v. Washington Post Co.,* 212 A.2d 335, 338 (D.C.1965) (citation omitted).

Here, the transcript of the hearing is readily available to the public. A reader whose interest was sparked can read copies of the transcript of the proceedings and determine whether he agrees with the reporter's "opinion."

Accordingly, the Court finds that the statements describing Plaintiff's arguments as "vague," "confusing" and incomplete are nonactionable expressions of "genuine opinion" and are protected by the fair comment privilege.

**Statements Describing Farahpour's Activities**

**"Throughout the hearing, Farahpour sat by Coles and occasionally interjected bits of his own commentary, unbidden by his lawyer or the panel. This is his**

---

5. Whether a challenged statement is capable of being proven true or false is a question of law for

the Court. See *Moldea v. New York Times Co.,* 15 F.3d 1137, 1144 (D.C.Cir.1994).

case, after all. He did the legwork to gather evidence, he researched the law." "Over the next few months, Farahpour made eight trips to Dover to search corporate records and studied every subparagraph of D.C. taxicab and corporate law."

■ Plaintiff contends that these statements defamed him because they suggest that Plaintiff "did not even do legal research for the case" and "had to be assisted by his client throughout the proceeding." Plaintiff's Opposition at 3. Plaintiff's claim that the statements about Farahpour are actionable is without basis.

The statements are not "of and concerning" Plaintiff. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 288, 84 S.Ct. 710, 730, 11 L.Ed.2d 686 (1964) ("[T]he evidence was constitutionally defective in another respect: it was incapable of supporting the jury's finding that the allegedly libelous statements were made 'of and concerning' respondent.") The statements describe Farahpour's activities and behavior, not Coles' activities and behavior.

Plaintiff argues that the statements are "of and concerning" him because they imply that he did not do the legal research himself and required assistance from the client. In other words, Plaintiff argues that there is defamation by implication. In this case, however, the words are not reasonably capable of sustaining the defamatory meaning which Plaintiff attaches to the words.[6] The fact that Farahpour did legal research does not necessarily imply that Plaintiff did not. A lawyer with excellent research capabilities could have an enthusiastic client.[7]

Even if the statements could be interpreted to be derogatory, they do not meet the heightened standard for judging a statement to be defamatory set forth by the D.C. Court of Appeals: "[A]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff

appear 'odious, infamous, or ridiculous.'" *Fleming v. AT & T Information Servs., Inc.*, 878 F.2d 1472, 1475–76 (D.C.Cir.1989) (citations omitted).

Plaintiff appears to be arguing a "libel-by-omission" theory in which he claims that the research he performed should have been mentioned. Plaintiff's theory of "libel-by-omission" is one with which courts must be very wary. As the Eighth Circuit held, "Courts must be slow to intrude into the area of editorial judgment, not only with respect to choice of words, but also with respect to . . . omissions from news stories." *Janklow v. Newsweek*, 788 F.2d 1300, 1306 (8th Cir. 1986), *cert. denied*, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986).

The Court finds that the statements regarding Farahpour's behavior and activities do not constitute actionable defamation.

**Statement Regarding Money**

**"With four other drivers, he [Mr. Farahpour] formed the ITOA Legal Defense Fund, soliciting contributions from Diamond's ranks of nearly 400 drivers. The donations of $20, $50, $100, and more were recorded in a green ledger, and most of the money has gone to pay their lawyer, John Coles."**

■ Plaintiff admits that he did receive "some" money from his clients, but denies that he received "most" of the money. Plaintiff does not have a record of exactly how much money he received and states that Mr. Farahpour's records would contain the best evidence of the amount paid to Plaintiff. Plaintiff approximates that he received $1300. Assuming that the statement is inaccurate with respect to the amount of money that Plaintiff received, the issue before the Court is whether the statement is capable of sustaining a defamatory meaning.

That a lawyer is paid by his client is to be assumed. Coles suggests that this statement wrongly implies that he was well-paid. Such an implication is not defamatory; it does not

---

6. It is for the Judge to determine whether a statement is reasonably capable of sustaining a defamatory meaning. *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C.Cir.1990).

7. The fact that the statements regarding Farahpour do not reasonably carry a defamatory implication with respect to Plaintiff is intertwined with and overlaps with the finding that the statements are not "of and concerning" the Plaintiff.

make Plaintiff appear "odious, infamous, or ridiculous." Most professionals hope to get paid well for their services.

Plaintiff appears to suggest that the statement is defamatory due to its juxtaposition with the statements that his arguments were "vague" and "confusing," thereby implying that he was a "well-paid, incompetent" lawyer. The statement that he received "most" of the money is several pages before any discussion of what happened at the Taxi Commission hearings. As such, the juxtaposition argument becomes attenuated. The real crux of Plaintiff's complaint is the reporter's critical analysis of Plaintiff's performance, which is protected commentary. That Plaintiff was "well-paid" does not make him any more "incompetent." Again, the statement that he was paid most of the money is not capable of a defamatory meaning.

### CONCLUSION

As Chief Justice Rehnquist wrote, "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988). While freedom of the press is not unbridled, subjective commentary such as was found in this case is protected. The press is not restricted to providing verbatim accounts of courtroom proceedings without any analysis. Thoughtful debate is stimulated by news reporting that provides both a fair and accurate accounting of public proceedings as well as informed commentary.

Newspapers cannot be held liable for imagined slights. The words actually written must be read in context and be given reasonable interpretations. Plaintiff suggests that the article depicts him as "incompetent," "unprofessional," "ill-prepared," "overmatched," "ridiculous," and suggests that he was "merely another obstacle Mr. Farahpour had to overcome in his quest for justice." Such an article was never published.

By representing the drivers in their dispute with Diamond Cab Company, Plaintiff injected himself into a matter of public interest and concern. Lawyers, like actors and artists, whose activities bring them before the public, must be willing to have their "performances" evaluated. The First Amendment protects articles such as this one that serve to promote debate in our free society. Litigation in high profile cases is not for the faint of heart.

Based on the foregoing, the Court finds that Plaintiff has failed to create a triable issue of material fact with respect to his defamation claim and that the statements complained of do not constitute actionable defamation.